# SUPREME COURT OF JUDICATURE

### OF THE

## STATE OF NEW-YORK,

IN OCTOBER TERM, 1839, IN THE SIXTY-FIFTH YEAR OF THE INDEPENDENCE
OF THE UNITED STATES.

---

[ Continued from Volume XXI.]

---

## THOMAS *vs.* DAKIN.

Questions arising under the GENERAL BANKING LAW [*]

GENERAL BANKING LAW. This was an action brought
by *Anson Thomas*, as president of an association called *The*
*Bank of Central New-York*, formed under the act to authorize
" the business of banking," passed 18th April, 1838, for the
recovery of three bills of exchange, drawn by the defendant

---

[*] This cause was argued in the supreme court at the July term, 1839,
and decided by that court at the following October term. A majority of the
court *held*, that the *act to authorize the business of banking*, passed 18th
April, 1838, is a valid and constitutional law, on the assumption that it re-
ceived the assent of *two-thirds* of the members eleeted to each branch of the
legislature, and that it would be presumed to have been *thus passed*, until
the fact was denied by plea ; at all events the court refused to pass upon the
question on a demurrer to a declaration by an assoeiation in a suit for the

and discounted by that bank. The defendant *demurred* to the declaration, which commenced in these words : " St. Lawrence county, ss. *Anson Thomas*, who is president of the bank of Central New-York, an association of persons formed for the purpose of banking, under the provisions of the act of the legislature of the state of New-York, entitled .' An act to authorize the business of banking ; ' and who prosecutes on behalf of said association, pursuant to the provisions of said act, *plaintiff*, by Kirkland and Bacon, his attorneys, complains of *Samuel D. Dakin, defendant* in this suit, by the filing and service of a declaration and notice of a rule to plead according to the form of the statute, for that, whereas, &c. (setting forth the *common money counts*, and an *insumul computassent*, alleging the indebtedness to be to *The Bank of Central New-York*, on the 20th May, 1839, and the *promises* to have been made *to the bank*, concluding to the damage of *the bank* of $10,000 ; ) and,

recovery of a debt. *All* the judges concurred in the opinion that associations formed under the act are *corporations*.

During the session of the legislature in the winter of 1840, the COURT FOR THE CORRECTION OF ERRORS heard two cases argued, which had been brought up by writ of error from the supreme court, presenting the same questions which arose in *Thomas* v. *Dakin*, and the decision of which was based upon the opinions delivered in that cause. The cases were elaborately argued by counsel ; and after advisement, opinions were delivered by THE PRESIDENT OF THE SENATE, the CHANCELLOR, and *Senator* VERPLANCK, for an affirmance of the judgment of the supreme court, and by *Senator* ROOT, for reversal. The judgment of the supreme court was *affirmed*, by a vote of 22 to 1. Whereupon the following *resolutions* were adopted :—

1. " Resolved, That the law entitled ' An act to authorize the business of banking,' passed 18th April, 1838, is valid, and was constitutionally enacted, although it may not have received the assent of two-thirds of the members elected to each branch of the legislature." This resolution was adopted by a vote of 23 to 1.

2. " Resolved, That the associations organized in conformity with the provisions of the act entitled ' An act to authorize the business of banking,' passed April 1st, 1838, are *not* bodies politic or corporate, within the spirit and meaning of the constitution." This resolution was adopted by a vote of 22 to 3.

The causes in which the above resolutions were adopted, are : " Warner & Ray v. Beers, President of the North American Trust and Banking Company," and " Bolander v. Stevens, President of the Bank of Commerce, in New-York," reported in a subsequent part of this volume.

Thomas v. Dakin.

therefore, the said plaintiff, as president of the bank of Central New-York, brings suit, &c." To the declaration was attached a notice, directed to the defendant, in these words : " Take notice, that the following are copies of the *drafts* or *bills of exchange*, which will be given in evidence under the money counts contained in the above declaration, according to the statute, &c." Then followed what purported to be copies of three bills of exchange : 1. A bill drawn by the defendant on Ralph Pomeroy, Esq. dated 1st February, 1839, for $1127,50, payable three months after date, to the order of the drawer and endorsed by him ; 2. A similar bill between the same parties, for $835,50, dated 6th February, 1839, payable three months after date, drawn and endorsed by the defendant ; and 3. A like bill, for $3000, dated 7th March, 1839, drawn by the defendant on Courtland Palmer, Esq., payable at sight, to the order of C. Gould, Esq. and endorsed by *Charles Gould*, president of the bank of Central New-York.

To this declaration the defendant, by *Ward Hunt*, his attorney, put in a *general demurrer*, and also assigned the following causes of special demurrer : 1. For that it no where appears in the said declaration, that *Anson Thomas, the plaintiff in said suit, had any cause of action* against the defendant for any matter or thing whatsoever ; but on the contrary, the cause of action therein stated, exists, if at all, in favor of The Bank of Central New-York ; 2. For that no authority exists in law for the plaintiff to sue the defendant on behalf of The Bank of Central New-York, or upon promises made to the bank ; 3. For that by the law of this state, no association of persons not incorporated are entitled to bring an action in the name of their president, but only in their individual names ; and 4. For that the act in the declaration mentioned, entitled " An act to authorize the business of banking," so far as the same purports to authorize this suit, is a violation of the provisions of the constitution of this state, respecting the creation of corporations, and is void ; and also, that the act is void, because it did not receive the assent of two-thirds of all the members

elected to the legislature of this state. The plaintiff joined in demurrer.

The cause was argued at the last term by *Ward Hunt*, Esq. for the defendant, and by *Charles P. Kirkland*, Esq. and *Samuel A. Foot*, Esq. for the plaintiffs.

The counsel for the defendant, presented the following points :—

I. No cause of action appears in the declaration, in favor of Anson Thomas, but the indebedness and promises are all to the bank of Central New-York.

II. Associations are partnerships of individuals, and cannot delegate or transfer their right to sue to a president, but must sue in their own names unless they are a corporation.

III. The act " to authorize the business of banking " passed, &c. authorizes the creation of an indefinite number of corporations at the pleasure of individuals, and is therefore unconstitutional and void.

IV. The Central Bank is a creation of this act, and consequently illegal and void.

The first and second points he observed related chiefly to the *form* of the proceedings, and as he intended to submit to the consideration of the court only what he deemed *material* and *essential* difficulties in the act by virtue of which this suit is brought, he would spend no time upon them. The general principles of pleading and of the common law, clearly require that suits should be brought in the names of all persons interested in the claim prosecuted, and that no one or more can sustain a suit without joining the others. He also supposed that a declaration laying the promise to one, the indebtedness to the same person, and the suit in the name of a different person, would be clearly bad. He insisted that in this case the symmetry and the consistency of pleading might be preserved, and yet, the proper result take place. The suit being in the name of the president, the promise and indebtedness should also be laid, as made and accruing to him, and by force of the statute the allegations would be sustained by the production of notes, &c. due to the bank itself. These questions, how-

ever, he said depended in a great measure upon the more important proposition that these institutions are corporations. If they are corporations, their right to sue in the name of their president is not doubted, which question he said he would proceed to consider.

Associations formed under this act are *corporations*. The revised statutes, 1 vol. 599, 600, declare the powers belonging to corporations, created in this state. § 1. Every corporation has power : " 1. To have succession by its corporate name for the period limited in its charter; and when no period is limited perpetually ; 2. To sue and be sued, complain and defend in any courts of law or equity ; 3. To make and use a common seal, and alter the same at pleasure ; 4. To hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter ; 5. To appoint such subordinate officers and agents, as the business of the corporation shall require, and to allow them a suitable compensation ; 6. To make by-laws not inconsistent with any existing law for the management of its property, the regulation of its affairs, and for the transfer of its stock. § 2. The powers enumerated in the preceding section, shall vest in every corporation that shall hereafter be created, although they may not be specified in its charter, or in the act under which it shall be incorporated."

These sections may be looked upon as a legislative definition of a corporation, and wherever these powers and characteristics are found to exist, a corporation is found. In perfect accordance with this definition, is the common law description of a corporation. A corporation is known by its qualities. Whether it be called a corporation or not is of no importance, but if it possess the requisite powers it is a corporation. No particular words are necessary to its creation, nor is it necessary that it should be declared or intended to be a corporation by the legislature. 2 *Jac. L. D.* 94, *Corp. I.* 2 *Kent,* 276, 3d ed. *Angel & Ames,* 17, 45, 6, 54, 95, 21, 23, 38. 2 *Johns. Ch. R.* 320, 324. 1 *Kyd Corp.* 4, 70.

The ordinary incidents to corporations are, 1. To have perpetual succession, or for the time limited in their char-

ters; 2. To sue and be sued, grant and receive by their
corporate name; 3. To purchase and hold lands and chat-
tels; 4. To have a common seal; 5. To make by-laws
for the government of the corporation; 6. The power of
amotion, or removal of its members. "Some of these
powers are to be taken with modification and restriction,
and the essence of a corporation consists only of a capacity
to have perpetual succession under a special denomination
and artificial form, and to take and grant property, contract
obligations, sue and be sued by its corporate name, and re-
ceive and enjoy in common grants of privileges and immu-
nities." *Authorities above cited.* A corporation may have
more than one name; it may have one in which to con-
tract, grant, &c., and another in which to sue and be sued.
It may be known by different names and may be sued in
either. 2 *Bac. Abr.* 5. 2 *Salk.* 237, 451. *Ld. Raym.* 153,
680. A name of some kind is indeed indispensable, accord-
ing to all the books, and according to the definitions cited.
A corporation, therefore, is an association of individuals
having: 1. Succession or existence under a special name
for the period limited by its charter; 2. Power to take
and grant property, contract obligations, sue and be sued
under a special name, like an individual; 3. Power to re-
ceive and enjoy, in common, grants of privileges and im-
munities.

. All associations of persons for the transaction of business
are either partnerships or corporations. The law recog-
nizes but two species of existences, corporations and natur-
al persons, and all unions of individuals divide themselves
into one of these classes. 1-*Black. Comm.* 123. The points
of difference between partnerships and corporations are nu-
merous and plain. In partnerships, each partner is in all
cases, so far as the public is concerned, the agent of his
co-partners and may bind them—may accept bills, give
notes, pay money, give releases, &c. whatever may be
the agreement between themselves. In corporations, the
officers alone are competent to act. The acknowledgment
of a debt by a partner will take it out of the statute as to
all; in the case of a corporation, one member's acknowledg-

ment has no effect. A partnership is dissolved by the death of any of the partners. So by the insanity of either. So by the bankruptcy of either. In many cases by voluntary act; each party still retaining all his property in the concern. A corporator by its very definition cannot be brought to a close in any of these modes. One member of a firm can in no case sue his co-partners upon a partnership transaction, during the continuance of the partnership. A corporator on the other hand may sue or be sued by the institution of which he is a stockholder. And this very suit is brought against one of the principal and original stockholders of the Bank of Central New York.

The definition of a corporation having been given, and some of the points of difference between a corporation and partnership exhibited, it is now proposed to examine the act of 1838, to ascertain into which of these classes the associations therein authorized must be resolved. This examination, it is confidently believed, will show that they possess, not only all the necessary powers of corporations, but all the powers and immunities *usually* bestowed by the legislature upon banking institutions. The act in question provides—§ 15. That any number of persons may asso ciate to establish offices of discount, deposit, &c. § 16. That they shall make a certificate, specifying, 1. *The name* to be used in the business; 2. *The place* where the business shall be transacted; 3. *The amount of stock* and the number of shares; 4. *The names of the stockholders;* 5. *The duration* of the association; and that this certificate shall be recorded, and be evidence for and against them on all occasions. § 18 gives power to the persons thus associated in the business of banking, to purchase bullion, foreign coin, receive deposits, &c. and authorizes the exercise of such incidental powers as shall be necessary to carry on such business, and to appoint officers, agents, &c. § 20. Shares are personal property, and unrestrictedly transferable. § 21. All contracts on behalf of the association are to be signed by the president, &c. § 24. The association may hold and convey such real estate as is necessary for the purpose of the association, and as may be necessary to take for

the security of its debts. Conveyances shall be made to the president or his successors, who may sell and convey the same for the association, free from all claim of the stockholders upon the same ; and it shall hold no real estate, except for the purposes specified. § 19 provides that the association shall not be dissolved by the insanity of any shareholder. § 23 provides, that all suits, actions or proceedings by or against such association, may be brought in the name of the president or against him, and shall not abate by his death, resignation or removal ; and that all judgments and decrees against the president shall take effect only upon the property of the association ; it provides, also, that no shareholder shall be personally liable, unless declared so by the articles. Here are found every essential and every ordinary attribute of a corporation, conferred upon these associations : 1. They may exist under the name assumed by them for any period, and, in the case of this bank, the period of its termination is fixed at some 4000 years hence. 2. They may sue and be sued, complain and defend in any court of law or equity, by and in the name of the president or other officer, and no individual is liable. 3. They may make and use a common seal. Under the 18th §, they may exercise such incidental powers as are necessary to carry on their business, and under this may make a seal, as has been done and is in daily use by the bank now in question. 4. They may purchase, hold and convey real and personal estate—§ 18 and 24 expressly authorizing this—though in the case of real estate, the conveyance is made to the association through the channel of the president. 5. They may appoint officers and agents, as they have appointed president, cashier, &c. 6. They may make by-laws. This is an indispensable power, and is fully authorized by the general clause before quoted from §18. They have all the qualifications given by the revised statutes to corporations. 1 R. S. 600.

Beyond all question, they have, 1. Succession or existence under a special or artificial name for the period limited by their charters or articles of association ; 2. Power to take property, contract obligations, sue and be sued under

Thomas v. Dakin.

a special denomination, i. c. 'under an appellation different from that which would belong to the associates if they were all sued or contracted, &c, in their individual names; 3. Power to receive and enjoy in common, (i. e. as a body,) grants, privileges and immunities. The counsel submitted that he had established the proposition that the institutions authorized by the general banking law of 1838, possess not only the necessary, but all 'the ordinary powers of corporations, and may safely be written down *corporations.* He instanced the *Oneida Bank,* one of the last banks incorporated by the legislature, and said it would be found to possess no one power or capacity, either by its charter or by the general law, that the institution suing in this case did not possess to an equal extent. If, then, no particular words are necessary to create a corporation, and if a corporation is known by and consists of its qualities and attributes, he said it would seem to follow that these institutions are corporations.

The next question discussed by the counsel was the following: Can the legislature pass a law authorizing the creation of an indefinite number of corporations, at the pleasure of individuals, and without any direct action of the legislature upon the particular corporations to be created? The provision of the constitution of this state affecting this question is found in *Art.* vii, § 9, and is in the following words: " The assent of two thirds of the members elected to each branch of the legislature, shall be requisite to every bill appropriating public moneys to local or private purposes, or creating, continuing, altering or renewing any body politic or corporate." The clause in question, he insisted, extended to and restrained the creation of corporations *authorized,* as well as those directly *created* by the legislature. An opposite construction would preserve perhaps the letter, but violate the whole spirit of the article. What was the object of this provision? clearly to impose a restraint upon the multiplication of corporations. What an absurdity, then, to apply it to a case where one corporation is to be brought into existence, and reject it in another, whereby thousands may spring into life. Again : no bill does or can do more than *authorize* a corporation. The bill creates it after

Vol. XXII. 3

Thomas v. Dakin.

certain acts of organization have taken place, but not until then : and if these are omitted, no corporation comes into existence. The provision, therefore, applies equally to a law *authorizing* corporations and to a law professing to *create* them.

To prevent the excessive increase of corporations, and particularly of monied incorporations, the convention of 1821 imposed new and unusual restrictions upon the power of the legislature to pass laws producing that result. They declared that the ordinary legislative power, to wit, a *majority*, should not be competent to bring into existence a corporate being. It was intended that the application for corporate powers in *every* given case should be deliberately examined, and that before the request should be granted in any instance, two thirds of the members elected to each house should be satisfied of its propriety and necessity. The discretion and judgment of the legislature is required upon every proposed corporation, and so great is the caution, that the legislative integrity and judgment of two thirds must be exercised and satisfied before the corporation can be created. Any *number of corporations* might be included without objection in the same act, as when particularly named, the judgment of the legislature would be applied to each. The log-rolling tendency of such an act would be objectionable, but constitutionally no objection is perceived. The exercise of legislative discretion and judgment by the law in question is entirely removed, and is exercised by individuals guided by no public interest, and bound by no public engagements, but governed solely by a regard to their own interests, real or imaginary. He therefore submitted that the passage of a law like that of 1838, authorizing unlimited creations of corporate existences, is at war with the spirit and intention of the constitution, and cannot be sustained by the courts.

At the time of the adoption of the present constitution, laws were in existence authorizing corporations, in certain cases, at the pleasure of individuals. These went to authorize, 1. Colleges and academies ; 2. Religious societies ; 3. Library associations ; 4. Medical societies ; and 5. Man-

Thomas v. Dakin.

ufacturing incorporations. These laws were not intended to be repealed, and have been acted upon very frequently since that time, in the creation of academies, colleges, churches, medical societies, &c. They were passed in 1811 and 1817, when no such constitutional restriction upon the creation of corporations, as now exists, fettered the action of the legislature. There was nothing requiring legislative discretion and judgment to be applied to each case presented, and the legislature might therefore lawfully enact general laws of such character as they should deem expedient. No argument can be drawn from the passage of these laws to support the present enactment; but viewing the present provision of the constitution as not applicable to those laws previously passed, it stands with full force in opposition to all general laws passed since 1822, when the new constitution became the supreme law of the land.

*C. P. Kirkland*, for the plaintiffs, submitted the following points, in support of the declaration, and the action of the plaintiffs:

I. *The first and second* causes of demurrer are not well assigned. The act expressly authorizes and directs the suit to be brought in the name of the president; and he suing in a representative capacity, must lay the indebtedness and the promises to the persons or body whom he represents.

The *third cause*, and *the first branch of the fourth cause*, are not well assigned; for the legislature might, without violating any constitutional provision, authorize suits in behalf of any number, or of any association of persons, *in the name of one of them.*

The matter stated in the second branch of the fourth cause, cannot arise on these pleadings.

II. There is no ground of *general demurrer* to this declaration, for the associations authorized by the act referred to are not " bodies corporate."

1. They are destitute of many of the essential and distinguishing attributes of a corporation, and without which a corporation cannot in a legal sense be said to exist.

2., They are in the nature of a limited or special partnership of individuals, possessing by legislative grant certain facilities in the transaction of their business.

3. The act is in substance a mere repealing act, authorizing the exercise of a privilege which was before prohibited, and prescribing the manner of its exercise.

4. Associations as authorized by this act, are a new mode of union, unknown at the time of the adoption of the constitution, and falling within no description or definition of " bodies corporate" then known and existing, and of course they are not within its prohibitory clause.

5. The act was not intended or supposed by its framers to create bodies corporate.

For these reasons, this act is not an act " creating a body corporate," in the constitutional sense.

III. The act is in no sense an act " creating" a body corporate.

It is in any event nothing more than an act authorizing or allowing, by *subsequent voluntary association,* the existence of a "body corporate."

Such an act is not within the inhibitory clause of the constitution.

1. This mode of giving existence to bodies corporate, as contradistinguished from the mode of direct action by the legislature, was in full force and operation at the time of the adoption of the constitution. To the latter, and not to the former mode, the prohibitory clause applies.

2. This mode is not within the letter of the clause.

3. It is not within the mischief intended to be remedied and prevented.

IV. Assuming that these associations are " bodies corporate," and that the act is an act " creating a body corporate," it is no objection to it that it creates or authorizes *more than one association ;* it being conceded, as it is and must be on this argument, that it received the requisite constitutional vote.

1. The prohibitory clause of the constitution does not in terms extend to this case : it is specially limited to the number of *votes* required.

Thomas v. Dakin.

2. It does not in spirit extend to this case ; for the *safe-guard* of a two-third vote is as much secured and obtained where a bill creates or authorizes *many* bodies corporate, as where it creates or authorizes *one* only.

3. This act, in this point of view, is to all intents the same as if it created by name all the associations that should be formed under it.

4. The continued legislative construction from the adoption of the constitution to this day, shows that the prohibitory clause does not reach this case : if it did, the joint rule of the senate and assembly on this subject would be supererogatory and idle.

5. The creation or authorization of more than one body corporate in one and the same bill, is a question of " *discretion* and *expediency*," not of *power*.

V. No judicial tribunal will declare void a legislative act, except in a case where there can be no rational doubt ; such declaration being an exercise of the highest attribute of absolute power. In this case were there great and serious doubts as to the validity of the law, the terrific and all pervading public distress that would result from its being judged void, should, on every salutary principle, turn the scale.

He argued that in point of form the declaration was strictly and technically correct, and was in precise conformity to the act ; *Statutes of* 1838, *p.* 260, § 21 ; that it laid the indebtedness and the promises as they existed in fact, and it referred sufficiently to the act to show that the suit was properly brought in the name of the plaintiff. The plaintiff is merely a trustee or representative ; and as a general rule, in declaring in such cases, the promises should be laid to the party represented, as in the case of executors, assignees of insolvents, and the like. 1 *Chit. Pl.* 15, 16. 2 *id.* 51. *Gould's Pl.* 172, 3. Some of the special causes of demurrer assigned proceed on the ground that the act in question is invalid as *authorizing* a suit to be brought in this manner ; but it has not been seriously argued that the legislative power is not competent to prescribe in what manner or in whose name suits may be brought, or to permit the institution of a

Thomas v. Dakin.

suit in behalf of an association of persons, or of a number of persons in the name of one of them.

It is also assigned specially as cause of demurrer, that the act in question was not in fact passed by a two-thirds vote ; but this point was not pressed on behalf of the defendant in the argument. It is by no means conceded that any act contained in the statute book, and duly authenticated, can be alleged in pleading, or shown in evidence, *not to be a law, that is,* not to have been passed. The evils that would arise from thus permitting parties to unsettle the whole statute book would greatly overbalance any injury that could possibly result from regarding the statute book as conclusive evidence of the *existence* of the laws found in it. But however this may be, it will, it is hoped, be shown in the course of the argument on the part of the plaintiff, that the act in question did not require a two-thirds vote, whether it actually received such vote or not.

The associations authorized by the act are not " bodies corporate" within the constitutional meaning of the term. *Const. art.* 7, § 9. The constitution, so far as the clause in question is concerned, went into operation on the 1st March, 1822, and the term " bodies corporate," therein used, is of course to be referred to the legal existence then known by that name. *Art.* 9, § 1. Among the *essential* qualities and attributes of a body corporate as then existing were the following : It must have a *name,* and *by that name* alone *must sue* and *be sued,* and do all other legal acts. 1 *Black. Comm.* 474. *Burns L. D. tit. Corp.* 192. It must grant and receive by its corporate name ; and the name is the very being of its constitution. 10 *Co.* 122. *Gilb. Hist. C. P.* 183. It must have a common seal. It has an inherent power to make by-laws or private statutes. 1 *Black. Comm.* 475. These are declared to be the " essential incidents" of every corporation, but they are all wanting here. These associations have *no name* by which to sue or be sued—to grant or receive—or to do any legal act—but all this is to be done in the individual, personal name of him who is president for the time being ; *Sect.* 21, 22, 24 ; and he is thus made personally and in his individual character, the agent, representative and trustee of the persons associated with him. They

Thomas v. Dakin.

have no common seal. They have no power, by the provisions of the act, to pass by-laws. No title to property can vest in the association as such ; it vests in the person who is president, as trustee of his associates ; they are therefore not an artificial person, as corporations are properly denominated. A vacancy in the office of president would suspend suits by and against him ; and this is totally repugnant to the idea of a corporation. Though these associations possess some of the incidents of corporations, they are destitute of others, which from the earliest periods of the common law, since such artificial beings have been recognized as existing, have been deemed as entering into their very constitution and essence, and have been inseparable from any definition or description ever given of them. They do not, then, fall within that class of legal existences recognised and known, at the time the clause in question went into effect, by the well understood and well defined term of ' bodies corporate.'

The exemption of the associates from personal responsibility does not render the associations corporations; for this is an exemption existing equally in the case of special partners ; nor do they derive a corporate character from the stock being declared personal property, and being made transferable ; for it will not be denied that the legislative power could, for all legal purposes, declare real estate to be personal property, and might render the property of any copartnership or individual transferable in the manner authorized by this act. The power to fix the period during which the partnership, fellowship or union may continue, does not *per se* convert them into corporations ; for so far as the constitutional question now under consideration is concerned, the legislature is not inhibited from granting to two or more individuals, their heirs and assigns, the privilege of doing certain acts, or carrying on a certain business for fifty or for five hundred years, and prescribing the mode in which title shall be made by those claiming as heirs or assigns for centuries to come. Such an act might be impolitic and unwise—even ridiculous—but the constitutional power of the legislature to passs it is not to be questioned. Yet it

is this power to fix the duration of the associations that is mainly relied on to prove them " bodies corporate." They more nearly resemble limited partnerships : there the special partner is not personally responsible ; *quoad* him, the *fund* only is liable ; suits are to be by and against the general partners, and they are the representatives and trustees of the special partners, as the presidents of these associations are of their individual associates.

The act in question is " an act to authorize the business of banking," and to effect this object, this anomalous species of union was devised. It was a repeal of existing restrictions—a permission to do what was before prohibited, and the various provisions of the act are to be regarded only as regulations, prescribing the mode in which the business now unrestrained should be conducted.

Should the court adjudge these associations to be "·bodies corporate," it is manifest that they will do so in express violation of the intention of the legislature, and they will invest them with a character and a name, which those who created them, not only did not design, but expressly repudiated. *Ass. Doc.* 1838, No. 122. *Joint Rules Ass. & Sen. No. 8.* And surely, in a matter of this grave import, a judicial tribunal should hesitate in declaring that the legislative department has done that, which they did not intend to do and expressly declared they had not done. But, assuming these associations to be " bodies corporate," it cannot be said that the act *creates* a body corporate : the most that can be alleged is, that it *authorizes* their subsequent creation by voluntary individual association. The act then clearly is not within the letter of the inhibitory clause of the constitution. Is it within its spirit ? At the time of the framing and adoption of this constitution, two modes of creating or forming corporate bodies were in existence and use, and familiarly known : 1. By direct action of the legislature, by bill creating by name one or more of them ; 2. By voluntary association under general laws then in force. These latter were numerous and diversified in their objects ; 1. Colleges and academies ;- 2. Religious societies ; 3. Library associations ; 4. Medical

Thomas v. Dakin.

societies; 5. Manufacturing corporations. 3 *R. S. pas-sim*. It is conceded by all, that these general acts were not abrogated by the constitution, though that instrument provides for the abrogation of all laws *repugnant* to it. *Art.* 7, *sec.* 13. Such has been the uniform construction given by the legislature for seventeen years, and the whole people for seventeen years have acted on it.

These general acts, then, and this *general mode* of creating corporations were not repugnant to the constitution, and were not abrogated by it. Under these acts, and in this mode, not less than eight hundred corporations have been formed since the present constitution became the fundamental law of the state. It can with little justice be argued if these laws and the right to act under them were left unaffected by the constitution, and were not reached by its abrogatory clause, that the legislative power to provide similar means in reference to subjects-matter deemed by the legislature equally innocuous, or equally worthy, was affected by that instrument. If it left in full force existing legislative acts, authorizing the subsequent creation of corporations by voluntary association for the manufacture of iron, cotton and glass, it would seem an absurdity to declare that it has taken away the legislative power to authorize, by general acts, in the ordinary forms of legislation, similar associations for agricultural, mechanical or monetary purposes, when this *mode* does not come within the letter of the prohibitory clause, and when at the time of the adoption of the clause there was a mode in use and well known, by being applied to which the prohibitory words would be fully satisfied. A result so anomalous, so unmeaning, and so contradictory, should not lightly be charged on the constitution! Every reason that can be given to show that the mode by *general* act was left untouched, will apply with equal force to show that the *power* to pass similar general acts was left equally unaffected.

Again: the question may be presented in another light. At the adoption of the constitution there were in existence and often used, two modes of *exercising legislative power* in the creation of corporations: 1. By act creating and per-

Thomas v. Dakin.

fecting the " body," giving it its name, place, exclusive privileges, and every thing (so far as the legislature was concerned,) requisite to render it a formed and perfect legal being ; 2. By general act, not creating the " body," not giving it even incipient existence—but instead of this, only confering the *power* of creating the body afterwards. The legislature was at that moment as omnipotent and uncontrolled in the use of the one, as of the other of these modes of exercising power. Objections which would apply to the one mode could have no application to the other ; and from the diversity of the mischiefs, the reasons which would exist for checking and restraining the one, would in no sense be reasons for checking and restraining the other. The convention and the people had both modes before them, and when engaged in the solemn work of framing and adopting the fundamental charter of their government—their *supreme law*—it is not to be supposed that they did not carefully study the language they employed, more especially in a clause introducing an extraordinary restraint on legislative power. When their language is used descriptive of, and in its terms embracing, only one of these modes, it can by no just process of reasoning be extended to the other. Had both been intended to be reached and affected, the proper phraseology could most easily, and would most naturally have been employed. Thus, after the word " corporate " (in the clause referred to) would have been added, " and to every bill authorizing the formation of such bodies corporate by voluntary association," or after the word " bill," would have been inserted " authorizing the formation of bodies corporate by voluntary association or."

Again : to ascertain the true sense of this clause, the mischief intended to be prevented must be considered. It is idle to admit *that the general acts were left in force,* and at the same time to say that the mischief to be remedied was " the inordinate increase of corporations," for the mischief was then left in undiminished vigor. Corporations could be indefinitely multiplied. No. Contemporary history as well as the leaving in full full force the general acts, proclaim another " mischief, " as the one at which this *constitutional*

Thomas v. Dakin.

blow was directed, and that was, the creation of monopolies, the grant of *exclusive privileges*, the attendant corruption of legislation, the appliances so often and so successfully used to procure these legislative favors.   In the then recent investigations respecting the Bank of America and the popular odium thereby excited against these exclusive charters, will be found the key to unlock the true meaning and intent of this clause of the constitution.   Under such circumstances, and with such a mischief to be remedied, an act of the character of that now under consideration, an act laying the axe at the very root of monopoly and, instead of conferring chartered privileges on the favored few, opening the field alike to all, could not have been within the purview of the constitutional provision.

There is high authority in support of the proposition that the *power* of the legislature as to these *general acts* was left where the constitution found it.   The revisers affirm it, *Rev. Rep. ch.* 18, *pt.* 1 ; for they reported for re-enactment in the *ordinary course of legislation, chap.* 15, *pt.* 1, all the general acts already referred to, *id. pt.* 1, *ch.* 18, *tit.* 6 ; and they also reported a *general act* for the incorporation of obituary societies. 1 *R. S.* 461. The legislature, years since, sanctioned the same opinion, for they re-enacted in the ordinary manner the *general* law authorizing the regents to incorporate academies. *Id.* The subject matter of all or any of these *general acts,* cannot affect the question.   The principle is the same ; and to discriminate between the numerous and diversified subjects and objects of incorporation, and to define those which might or might not constitutionally be embraced within general acts, would be a task incapable of execution.   The intention of the clause manifestly was, either to prohibit *all* future corporations except in the mode prescribed, that is, by a two-thirds vote ; or, to leave in existence alike the *general acts,* and the power to pass similar acts.   And it would seem that the latter must necessarily be the result, as the concession that the *general acts* are left in full force, establishes that the former could not have been the intention.

Again : where there are two matters, either of which may be regarded as the " mischief " to be remedied by a constitutional provision, the court, on every salutary principle, will adopt that which will sustain and uphold a legislative act, whose constitutional validity is questioned. Here, by adopting as the " mischief," and as the " intent, " those contended for by the plaintiff, the act in question is supported ; and the remedy is most effectually aided and advanced.

It is insisted on the part of the defendant, assuming these associations to be "bodies corporate," and that the assent of two-thirds was required and was given to this act, yet that the legislature had no power in and by one and the same bill to authorize the creation of an indefinite number of these bodies ; and that the act is void because it creates, or authorizes to be created, more than one of them. Had the prohibition just mentioned been intended, it cannot be doubted that the appropriate language to express that intention would have been used ; language clearly and in terms exclusive. Thus : " No bill shall contain any provision whereby more than one body corporate shall be authorized or created," or, " every body politic to be created, shall be created by a separate and distinct bill." But the provision is, that " the assent, &c. shall be requisite to *every* bill creating, &c." and not that " *every* such body politic shall be created by separate bill." Now under this act, The Bank of Central New-York, the North American Trust and Banking Company, and the Bank of Commerce are formed ; this act " created " them. The required assent was given alike to each ; but the argument is, that it was not given to The Bank of Central New-York, because, *at the same time*, it was given to the Bank of Commerce, and to the Trust and Banking Company ! The check provided by the constitution is not as to the *mode* or form of granting corporate powers, whether that mode be by act creating many bodies, or by act creating one, both of which modes, as we have seen, were in existence and practice at the time of its adoption, but the restriction is as to the *vote* required. It does not inhibit either of the *modes* then in use, but (if the defendant's argument is correct, that this species of act requires two-

thirds,) to render either available demands a different *vote*, namely, a vote of two-thirds, instead of a majority. In other words, an act creating or authorizing twenty corporations, or an act creating one, must now be passed by a vote of two-thirds. The form or matter of the bill is not changed, it is the vote only. This view is clearly illustrated by stating in words what was requisite to the validity of an act before the constitution, and what is requisite now. Thus, prior to the adoption of this clause, it would have been stated, that " the assent of a *majority* of the members present, and voting, (assuming the presence of a quorum,) of each branch of the legislature is requisite." Now, " the assent of *two-thirds* of the members elected to each branch is requisite," &c. A precise view of the power prior to, and the power since the constitution, is here presented ; and it is manifest that the difference is not in the kind, form, contents, or matter of the bill, but merely in the number of votes, required, (conceding for the sake of this branch of the argument, that a *general bill* requires a two-thirds vote.) The joint rule of the two houses above referred to shows that the legislature contemporaneously determined and have uniformly considered that the constitution contained no such inhibition, for otherwise such a rule would have been idle, and supererogatory. It may be unwise, inexpedient, nay, dangerous to pass such an act, but the question of expediency is virtually different from that of constitutional power.

The distinguished jurist, who occupied the gubernatorial chair of this state in 1838, had no doubt of the power of the legislature to pass the act in question, *Gov. Message*, 1838 ; and in his opinion numerous others equally distinguished have fully concurred. The mere existence of corporate powers was not the evil which gave rise to the restrictive clause in the constitution, and which it was designed to guard against and to mitigate. It was their exclusiveness, their partial, monopolizing character, the frauds and corruption by which they were sought and obtained. Grant to *all* alike the power and the privilege, under such restraints, conditions and limitations, as will, in the judgment of the people, expressed by their representatives, render safe their

Thomas v. Dakin.

use and exercise, and no mischief would arise ; none would be found to complain.

The court are called upon by the defendant to exercise the highest and most delicate power with which they are vested—that of adjudging unconstitutional and void a legislative act. It has been declared by judicial authority, to which every American judge and lawyer will bow with deference, that this is a power never to be exercised except in cases in which there can be no rational doubt. 4 *Wheat.* 625. *See also* 1 *Cowen*, 564. This, it is submitted, can with no pretence of truth or justice be deemed such a case. The consequences of a decision annulling this act, may, and on every just and salutary principle should be regarded. To speak of the evils which would flow from the judgment which the court is here desired by the defendant to pronounce, would be to present a picture of distress, confusion and embarrassment, unexampled, at least in this land. And may it not justly be said, in this, as was said in another case, by one of the brightest ornaments of the bar of our country, that " even admitting this to be a case where the validity of the law might be justly doubted, the multitude of evils that would result from considering the act unconstitutional, ought to determine the question in favor of its validity.". 1 *Cowen*, 556.

*S. A. Foot*, (also for the plaintiffs,) commenced his argument by adverting to the laws passed in this state *in restraint of banking*, unless specially authorized by the legislature. The first act on the subject was passed on the 11th April, 1782, incorporating the " Bank of America," in which it was declared, that no other bank, public or private, should be established within this state, during the then war with Great Britain, on pain of the forfeiture of one hundred pounds for every offence, by every person concerned in such bank or banks. *Statutes of N. Y.* 1 *vol. p.* 50, *Greenl. ed.* In 1804, a second act was passed, entitled "An act to restrain unincorporated banking companies," *Statutes of N. Y.* 3 *vol. p.* 615, *Webst. ed.*, which has been continued to the present time, having been strengthened and its severity

Thomas v. Dakin.

increased by enactments made from time to time. *Statutes, sess. of* 1818, *p.* 242, § 1, 2. 1 *R. S.* 702. 2 *id.* 234. But for those acts, every citizen copartnership or association would have had an unqualified right to commence and prosecute the business of banking. The " act to authorize the business of banking," passed 18th April, 1838, (the act now under consideration,) he said, was a modified repeal of the *restraining acts,* and as such, is not only unobjectionable, but highly meritorious, inasmuch as it restores to the citizens of the state their former rights. But (he observed) it is said that it confers *corporate powers* upon the associations which it authorizes, and, by doing so, virtually *creates corporations* in conflict with a provision of the constitution of this state, in consequence of the act not having been passed in conformity with the requirements of the constitution.

The counsel said that he would, in the first place, insist that the *associations* formed under the act of 18th April, 1838, were *not corporations ;* such associations not possessing the atributes characterizing corporations. He said that there are *four distinctive indicia* which mark an aggregate corporation, and separate it from every other legal existence : neither of which appertain to these associations. These are : 1 A *collective existence* by *name,* created by the sovereign power, exercised directly or mediately ; 2. A standing in court as a colective existence by a given name or designation, with the rights and liabilities of a party litigant ; 3. Power to take and convey title to property, acquire and give rights as a collective existence, and by its given name or designation ; and 4. Power conferred by statute to make by-laws, or in other words, to prescribe rules of action for persons without their consent.

As to the first of these *indicia,* he observed, that this characteristic is often expressed in different language. Chancellor Kent calls it " a capacity to have perpetual succession, under a special denomination, and an atificial form." 2 *Kent's Comm.* 277, 2*d ed.* This phraseology indicates mere being by name, to which may be attached the qualities of beginning, end, perpetuity, enjoyment of rights and

the performance of duties. Chief Justice Marshall, who always appears, when discussing a subject, to have his mind constantly fixed on the principles and true nature of things, speaks of this feature of a corporation in this way : " A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it. Among the most important are *immortality,* and, if the expression may be allowed, *individuality ;* properties, by which a perpetual successon of many persons are considered as the same, and may act as a single individual. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 636.

The existence of a corporation enables many persons to have succession in the enjoyment of the franchise conferred ; and if its existence is perpetual, then perpetual succession. Succession, however, is a property of the individuals who exercise the corporate rights. They succeed each other. But to say that the corporation itself has perpetual succession, which is the expression in general use, and sufficiently accurate for general purposes, appears to be a solecism. Besides, there may be aggregate corporations which have no succession. Twenty individuals may be incorporated on the principle of tontine, or in other words, till the death of all the corporators but one ; and the share of each, instead of being transferable, to belong to the survivors, and the last one to take the whole corporate fund. And in a great variety of other forms, aggregate corporations may be created, without giving to them the property of succession. Every corporation will be without it, whose charter confines the exercise of its corporate rights to certain designated individuals. *Perpetual* succession is wholly inapplicable to corporations created for a given time. It can only apply to those which have perpetuity, of which there are many, but not near so many as there are whose existence is to continue for a definite period. Whatever there is of succession, connected with a corporation which has a fixed period for its termination, is *continued succession.*

But succession is not peculiar to corporations. It often is, and may always be, a property of voluntary associations, if the associates choose so to agree in their articles of association. Strict partnerships are frequently formed under an agreement to admit succession of membership. Almost all the voluntary associations which have been formed in this country, within the last four or five years, and there have been not a few, for the purchase of and speculation in lands, have contained provisions for succession of associates. The joint stock companies in England, for banking and other purposes, also have succession.

When, therefore, we apply the term *succession* to a corporation, as a property peculiar to it, we express no more than mere *continuation* or *being*. A corporation has an existence independent of succession, and is known to the law without that property. In grants of lands to corporations, the word "successors," though usually inserted, is not necessary to convey a fee simple. *Ang. & Am. p. 89, c. 5, § 5.* An aggregate corporation includes the idea of an association of two or more individuals; and hence it is *a collective existence*. And as its existence is only in contemplation of law, it can only be known by name; and hence is a collective existence, *by name*. And as it can only be created by the sovereign power, exercised directly in calling it into being, or more circuitously, by prescribing certain acts, the performance of which shall constitute a body corporate, embracing those who perform them, it is *created by the sovereign power exercised directly or mediately.*

Creation by *sovereign power* is the peculiar feature of the existence of a corporation. A partnership, joint stock company, and every other voluntary association, has a collective existence, and by name. But such existence and name rest on contract; they arise from the voluntary agreement of the associates; they have their origin in the will of individuals. Not so with a corporation. It derives its being from a higher source, from the sovereign power. The legislature, in which that power rests, speaks, and the corporation comes into being, with the properties of beginning, continuance and end, unless the creating power declares its exist-

ence shall be perpetual—and then, with the properties of beginning and perpetual continuance. Not only the being itself, but the *name* also, by which it shall be known, must come from the same source, to distinguish a corporation from other associations. This name, too, in the language of the books, must be a *common* name ; that is, fixed, uniform, unchangeable, not dependent on the will of individuals. And although a corporation may have two names, one " by which it may take and grant, and another by which it may plead and be impleaded," *Ang. & Am.* 56, yet whatever name it has, must come from the creating power, and be conferred by it. It is impossible to conceive of a legal entity, taking, giving and enforcing rights, without a name. With its creation, therefore, must be given its name—they are inseparable. This intangible, invisible existence, can only be known by its proper designation, and the name must represent the collective existence ; not an officer of the corporation, not an individual, not any thing, except the corporation. It is the *name* of the *corporation.*

2d. *It must have a standing in court as a collective existence, by a given name or designation, with the rights and liabilities of a party litigant.*

This is obviously an essential requisite of a corporation. It can neither have nor maintain a legal existence, unless it is able to resort to the judicial tribunals of the state to enforce its rights ; nor could the community tolerate a being, which had power to enforce rights in its favor, and yet was not amenable to the courts of justice, so that rights might be enforced against it. As parties cannot litigate in our courts without names, every corporation must have a name by which it can sue and be sued. This is a feature which clearly distinguishes corporations from voluntary associations. No such association can sue or be sued in its assumed name ; but the parties who compose it must appear before the court, or those in whom their property is vested in trust for them. The distinction is between the collective existence appearing by its name, and individuals appearing by their names. In the former case, the court recognizes the body corporate as a legal existence, having a right to be

Thomas v. Dakin.

heard ; and in the latter, it recognizes individuals, who claim to be heard in their own right, or as trustees for others. The idea should be kept distinctly in view, that this peculiar feature of a corporation consists in the right of the *corporation itself* to appear in court by its *own name*, and not in the name of one of its officers, or of any other person as a trustee for it. Voluntary associations, often, and municipal corporations occasionally, are permitted by statute to sue and be sued in the name of some officer or trustee. The joint stock companies in England, I believe, are all permitted to sue and be sued in the name of any of their registered officers ; and several of our cities and villages, which are municipal corporations, are allowed to sue in the names of their officers ; but I am not aware that any private corporation in this state can sue or be sued, except in its corporate name. While a voluntary association may be allowed by statute, to sue and be sued in the name of one of its officers, without thereby becoming a corporation ; so, a corporation may, by a statutory provision, sue or be sued in the name of one of its officers, without losing its corporate character. But a collective existence, irrespective of individuals, suing and being sued by its name, is a peculiar property of a corporation, and belongs to no other kind of association.

3d. *Power to take and convey title to property, acquire and give rights as a collective existence, and by its given name or designation.*

This is another distinctive characteristic of a corporation, which separates it from all other associations. When a copartnership, or any other unincorporated company, takes a title to real or personal property, that title is conveyed to, or vests in the individual members of the company, or some of them, designated by agreement to receive it for the benefit of all. And when title is transferred by such an association to a third person, it is not conveyed by the company in its collective capacity, but by the individuals who compose it, or by those who hold the title for them. While the company buy with the common fund and sell to benefit it, and the transactions are in fact those of the association, the title to their property comes and goes, to and from, one or

more individuals. A corporation, alone, of all associated action, takes and conveys title, acquires and gives rights, collectively and by its collective name.

4th. *Power conferred by statute to make by-laws, or in other words, to prescribe rules of action for persons, without their consent.*

This power is always enumerated among the ordinary incidents to a corporation; but two distinguished writers have not considered it among the essential requisites. Chancellor Kent has not mentioned it, when stating the essence of a corporation; 2 *Kent's Com. 2d ed.* 277; and Mr. Kyd expressly says, it " is not so inseparably incident to a corporation *aggregate,* that it cannot subsist without it; for there are some aggregate corporations to which rules and ordinances may be prescribed, and which they are bound to obey." 1 *Kyd on Cor.* 69.

The legislature may, undoubtedly, when creating a corporation, enact its by-laws, and prohibit it from making any others. So it may mould these artificial beings into any form which the public interest may require, or even the fancy of a committee suggest; and give them all, or none of the peculiar features of a corporation, as has been already remarked. But when inquiring, as we now are, for the distinctive characteristics of a corporation, without reference to direct and effective legislative action, the question is not, what the legislature, which has unlimited authority in this respect, can do, or might have done, in any given case, but what is the essence of a corporation, independent of the creative action of the sovereign power? and we are not aided in the latter by ascertaining the former. Hence, the remark of Mr. Kyd, that the power to make by-laws is not an inseparable incident to an aggregate corporation, because rules and ordinances may be prescribed for some aggregate corporations, which they are bound to obey, appears to be unsound in principle, and his reason to be wholly insufficient for his proposition.

The point of inquiry is, can a corporation exist without by-laws? and if they are not made for it, by the power which creates it, must not the corporation itself have author-

ity to make them? Chancellor Kent takes his statement of
the essence of a corporate body from Mr. Kyd, and cites
him as his authority. 2 *Kent's Comm.* 277, *2d ed.* We
have then only Mr. Kyd's assertion, for he cites no authority,
that power to make by-laws is not an inseparable incident to
a corporation.

A corporation acts wholly by agencies. It can do nothing
itself. It is a collective being, invisible, intangible, and ex-
ists only in contemplation of law. It is neither seen nor felt,
except by its agents. Those agents are its officers and ser-
vants: they act under authority, and their duties and liabil-
ities are regulated and tested by the rules which regulate the
relation of principal and agent. These are well established
principles.

How can a corporation have an effective existence, with-
out power to prescribe rules of action for its officers and
servants? Let it have existence, a right to sue and be sued,
and to take and convey title: can it then act efficiently?
Does it not yet want one more requisite of life? Does it
not want power to regulate and direct its action? And as
it acts through the instrumentality of agents of all grades, from
the president down to the servant, must not that power be
one, which enables the corporation to prescribe rules of ac-
tion for persons without their consent? The acts of every
corporation in this state may be appealed to for the purpose
of showing that the exercise of this power is universal; and
I doubt whether there is a corporation in the state, which, if
all its by-laws were repealed, and the power taken from it of
enacting others, could fulfill the object of its creation; and if
not, it must, of course, cease to exist. This power, too, must
be exercised irrespective of the consent of the persons affected
by it: otherwise, every member or agent of a corporation
must express his consent to be bound by its by-laws; and
when their efficacy depends on consent, their character
is entirely changed—they then become matters of contract;
they cease to be laws and become agreements.

Of the latter character are all the rules and by-laws of
voluntary associations. Their whole basis is contract, and
the superstructure is the same. Herein lies the difference be-

tween corporations and all unincorporated companies. The former have authority from the sovereign power to make by-laws, and may, therefore, prescribe rules of action for persons without their consent; the latter have no such authority, and can only prescribe rules of action for their members, agents, or others, with their consent; and thus the power to make by-laws which control the action of individuals without their consent is a peculiar feature of a corporation. The four requisites above stated, when united, constitute an effective being, which can perform the functions of legal life, and without either is helpless, unless the defect be supplied or other powers given by statute; but to give a voluntary association the character of a corporotion by reason of its possessing corporate powers, it must have *all the four requisites* above specified.

The counsel observed that other properties have been said to be peculiar to corporations; but that to him they did not appear to be so on reason or authority. *One of which is the having a seal.* Formerly it was held that a corporation could be bound only by its seal, and when that was the rule, a *seal* was of course of the essence of a corporation; but that rule has been abrogated for years, and now a seal, though an ordinary and very important incident to a corporation, is no longer an essential requisite. 15 *Wendell,* 265. *Another is the right of enjoying privileges and immunities* IN COMMON. This doctrine is laid down in 1 *Kyd on Corporations,* 13, and is followed by Chancellor Kent, 2 *Kent's Comm.* 277. This, the counsel insisted, cannot be of the essence of a corporation, because common enjoyment and common advantages are incident to *voluntary associations,* as well as to *bodies corporate. Another is the exemption of the members of a company from personal liability* for its debts. This the counsel observed, is said by some to be peculiar to a *corporation,* and to distinguish it from a *partnership.* That, he said, was a mistake. Members of corporations are often made personally liable by the acts of incorporation for the debts of the company; sometimes in whole and sometimes in part. He said there are many instances of this in our state, both in our general and special

acts of incorporation. There is also a striking instance of members of a copartnership being liable, only to a qualified extent, for the copartnership debts, alluding to our statute concerning limited partnerships.

The members of all voluntary associations he said might, by agreement, regulate the extent and nature of their liability for the company debts, and such agreement will bind the parties to it, and, probably, all persons dealing with the association and having knowledge of it; and that it might safely be assumed, that exemption, in whole or in part, of the members of a company from personal liability for its debts, is not an essential requisite of a corporation.

*Another, and the last, is the transferability of shares without any restriction, at the mere will of the holder.*

Were it not, that some English cases countenance the idea, that unqualified transferability of shares is a peculiar feature of a corporation, it would be unnecessary to dwell long on this topic. For it must be evident to all, that this is a matter which may be regulated by contract in all voluntary associations; and may exist, or not, in corporations. Partnerships and joint stock companies not only may, but do in fact, regulate the transfers of stock; sometimes permitting them, without any restriction; at others, restraining them to transfers on the books of the company; at others, until the debts due by the holder to the company are paid. And the like provisions are often made in our acts of incorporation; but more frequently the transfer of the stock is left to the discretion of the corporation, with power to regulate it in their by-laws.

The cases referred to he said arose under an English statute, which, with the decision upon it, furnish the strongest judicial light discovered by him on the subject of the essential requisites of a corporation; and although the statute is now repealed the light which it elicited still shines, to aid and direct the search for truth. The counsel here cited *Collyer on partnership*, 620 to 625, *passim, and the cases there quoted.* In respect to the *transferability of shares*, he remarked that this property is not mentioned by any author,

nor in any case, as a corporate attribute except in the ca-
ses arising under the statute referred to.    It appears to have
originated wholly from the English statute, 6 Geo. I. ch.
18, § 18, mentioned in _Collyer,_ and the error of considering
it a corporate property, he contended arose from a want of
care in judging of it, as a distinct offence, which it is by that
statute, instead of judging of it as a corporate act, and as
such, an offence by the statute.    A few references to the
language of the act, and the decisions upon it, he said would
show this.    The recital is—" And whereas, in many cases,
the said undertakers and subscribers have presumed to act
as if they were corporate bodies, and have pretended _to
make their shares transferable_ or assignable without any le-
gal authority," &c.    And the enactment is, that such un-
dertakings, " and more particularly the acting or presuming to
act as a corporate body, _the raising, or pretending to raise
transferable stock, transferring, or pretending to transfer,_
or assign any share in such stock, without legal authority,
&c., shall be deemed illegal and void."    " The offences,"
says Mr. Collyer, " which are more particularly pointed out
by the statute, are, the presuming to act as a corporate body ;
the raising transferable stock ; the transferring such stock."
The transferring of stock is thus obviously a distinct of-
fence from that of presuming to act as a corporate body.
Either might be committed and punished without the other.
Yet, says Mr. Collyer, in a subsequent page—" The only
act, however, which has been expressly stated to be an as-
suming to act as a corporation, is that of making the
shares _transferable without any restriction, at the mere will
of the holder._"    He adds—" The _universal_ illegality of this
proceeding was doubted, as we have before observed, by
Lord Ellenborough.    But in _Joseph_ v. _Preber,_ 3 _Barn. &
Cres._ 639 ; 5 _Dowl. & Ryl._ 542, it was held to be univer-
sally illegal, not only as it should seem, under the words of
the statute on that particular point, but with reference to
the more general offence of acting as a corporation."    C.
J. Best, in a subsequent case, 4 _Bing._ 267, says : " There
can be no transferable share of any stock, except the stock

Thomas v. Dakin.

of corporations, or of joint stock companies created by acts of parliament." This language is loose and confusing, and clearly shows, that the minds of these distinguished jurists were far from being directed to the question, whether transferability of stock is an essential property of a corporation. Ch. J. Best states it in substance, as an unqualified proposition, that shares of stock are not transferable, except by act of parliament. With great respect, that is an error. The stock in every voluntary association, by agreement of the associates, may be transferable at the will of the owner, as has been already stated and illustrated ; and daily practice confirms it.

But from whatever source the notion came, that transferability of stock was an exclusive attribute of a corporation, or however well it is sustained by authority, one position respecting it is clear, and in that all the cases concur, viz : that to render the transferability of shares, a corporate property, *the shares must be transferable at the mere unrestricted option of the holder.* And where the shares could not be transferred to a person who would not enter into the original covenants ; and where the same person could not hold more than twenty shares ; and where the transfer of shares was limited to persons residing in the neighborhood ; and where a person could not become a member of a company till he had signed the partnership articles, nor until he had been approved by a certain majority of persons present at a meeting of the society—the court of king's bench gladly availed themselves of these circumstances, to hold the associations valid, under the English statute, and of course, that such restricted transferability was not a corporate attribute. *Collyer,* 624, 625, *and cases there cited.*

There is only one clause in our general banking law which regulates the transfer of stock ; and that, instead of permitting the shares of the associations to be transferred at the mere unrestricted option of the holder, subjects them to two statutory restrictions, and also to as many others as each association may think proper to impose. The words of the clause are, " The shares of said association shall be

deemed personal property *and shall be transferable on the books of the association, in such manner as may be agreed on in the articles of association;* and every person becoming a shareholder by such tranfer, shall, in proportion to his shares, *succeed to all the rights and liabilities* of prior shareholders." 1. The shares are transferable *on the books* of the association. 2. The transferee succeeds, not only to the rights, but to the *liabilities* of the prior shareholders. These are imposed by law upon him. 3. The shares are transferable on the books of the association, *in such manner as may be agreed on in the articles of association.* This enables each association to impose such restrictions as it pleases; and so obviously is the holder of stock in the associations restrained from transferring his stock at his *mere unrestricted option,* that it seems unnecessary to occupy more time with this topic.

The counsel next proceeded to examine those parts of the act of April, 1838, which it had been insisted conferred corporate powers on the associations authorized thereby. He cited § 15 and 16 of the act, and in connection with those sections quoted § 1 of the act to restrain unauthorized banking, 1 *R. S.* 711, and proceeded to enquire whether such associations, have all or any of the *four essential requisites,* as defined by him of a corporation.

·First: *Has every association a collective existence by name, created by the sovereign power, exercised directly or immediately?* and then observed, who can fail to see, that the object of passing this clause of the fifteenth section of the general banking law, was to repeal, in effect, the first section of the restraining act, and open banking to the community? The legislature evidently intended to allow any person, who chose, to become a member of an association to conduct the business of banking; and when they say, "any number of persons *may associate* to establish," &c. is it not a perversion of their language to insist that they thereby call into being an indefinite number of corporations? The enactment is merely permissive. It only removes a previous legal restraint, and allows free action. It creates noth-

ing ; but allows parties to contract with each other to accomplish an object theretofore unlawful. This will appear the more evident, by comparing the language with that of our general acts of incorporation. Take, for example, the act relative to incorporations for manufacturing purposes. The first section directs, that "any five or more persons, who shall be desirous to form a company," &c. "may make, sign, and acknowledge, before a justice of the supreme court," &c. "a certificate in writing, in which shall be stated the corporate name of said company," &c. And the second section enacts, "that as soon as such certificate shall be filed as aforesaid, the persons who shall have signed and acknowledged the said certificate, and their successors, shall, for the term of twenty years next after the day of filing such certificate, be a body politic and corporate, in fact and in name, by the name stated in such certificate, and by that name," &c. 3 *R. S.* 310. Under this law, a corporation is brought into existence by legislative enactment. Under the general banking law, an association is formed by contract, by agreement of the parties. By that law, any number of persons may associate—and if they *do associate,* it is their own voluntary act ; and their association derives its being from their mutual consent—and in like manner, may be dissolved at their pleasure. They are allowed by agreement to fix the period of its commencement and termination, as in all other cases of voluntary associations—time of commencement and dissolution, like a strict copartnership ; and if the parties are dissatisfied with each other, or the business, they may by general consent dissolve at any time before the period fixed for the termination of the association. In these respects, the associations are wholly unlike corporations. The latter always have a period fixed by law for their commencement and termination, unless they are perpetual ; and then, their perpetuity is likewise declared by law, and it is not in their power to dissolve themselves. They may commit acts which forfeit their existence, but cannot dissolve at pleasure.

Furthermore : it is understood to be the true construc-

tion of this statute, and that such construction was deliber-
ately given to it by the late comptroller and attorney-gene-
ral, after full and mature examination, to authorize *any in-
dividual* to conduct the business of banking according to its
provisions. And it is a well known fact, that several indi-
viduals have deposited their respective securities with the
comptroller, received bills, and are now prosecuting the
business of banking in their respective offices, and on their
respective accounts. If this is the true construction of the
act, and there appears to be no reason to doubt it, there
would seem to be an end of all pretence even, that those
who avail themselves of its provisions are corporators. The
statute certainly does not constitute each of the individuals
referred to, a corporation, or, in other words, give each of
them a corporate existence. Nor does the statute give a
*name* to the association formed under it, as is always the
case, when a corporation is created ; nor does it adopt any
selected by the parties, as in the general act of incorpora-
tion for manufacturing purposes. The name of each asso-
ciation is given by agreement of the associates. They de-
termine and agree what it shall be. It is given by contract
and not by statute. It comes from the will of individuals,
and not from the sovereign power. Besides, the asso-
ciations have no common name by which they are known ;
by which they take and give title and make contracts, and
by which they sue and are sued. Nor have they two
names, one by which they may take and grant, and another
by which they may sue and be sued. They have only one
name, and that for a single purpose, viz : " to be used in
their dealings." They neither take, nor grant, nor make con-
tracts in that name, nor do they sue, nor are they sued by it,
as will be more distinctly seen when other sections of the
statute are examined.

SECOND : *Has every association a standing in court, as a
collective existence by a given name or designation, with the
rights and liabilities of a party litigant ?* The clauses of
the statute which relate to this part of the subject, are found
in the 21st and 22nd sections. These are as follows : " And
all suits, actions and proceedings brought or prosecuted by

or on behalf of such association, may be brought or prose-cuted in the name of the president thereof."—" All per-sons having demands against any such association, may maintain actions against the president thereof." The ground taken by the counsel for the defendant is, that the suits permitted by these provisions of the statute, are to be brought and prosecuted in the name of the *office* of the president of the association, and not in the name of the person who fills the office ; and that each association has therefore a name given to it by statute, by which it sues and is sued. This is obviously an erroneous construction of the act. The title of this very cause is a practical evidence of the error. It is in the name of *Anson Thomas*, president, &c. ; and not in the name of *The President* of the Bank of Cen-tral New-York. The language of the statute shows, that the office of president is referred to as a mere description of the person in whose name the suit may be brought, and against whom it may be maintained. The words are, "all suits," &c. " may be brought or prosecuted *in the name of* the president thereof," and not in the name of the *office* of president thereof. So, " all persons," &c. " may maintain actions against *the president* thereof," and not against *the office* of president thereof. But there are other clauses in these two sections of the statute which are conclusive of its construction.

If the suits may be brought in the name of the office of president, or maintained against the office of president, then no suit brought in the name of that office, or against it, would abate by death, resignation or removal of the officer. But in the 21st section, the legislature provide, that no "suit, action, or proceeding," " brought or prosecuted in the name of the president thereof," " shall abate by reason of the death, resignation or removal from office of *such president*, but may be continued and prosecuted according to such rules as the courts of law and equity may direct, *in the name of his successor in office*." So also, in regard to suits against the president, the 22d section contains the following provis-ion : " which suits or actions shall not abate by reason of

the death, resignation or removal from office of *such presi-*
*dent*, but may be continued and prosecuted to judgment
against *his successor.*"    After reading these provisions, ar-
gument surely is unnecessary to show that the suits are to
be brought in the name of and against the person holding
the office of president; and that the office is used in the
statute merely as a description of the person.

Another consideration arises in this connection ; and that
is, that when a president, who is either plaintiff or defend-
ant, dies, the suit, though not abated, is suspended until a
successor is appointed ; and when so appointed, the suit
does not proceed, of course, against him without any pro-
ceeding in court, but "according to such rules as the courts
of law and equity may direct;" which proceeding would
naturally be a suggestion on the record of the death of the
president in whose name the suit was pending, and the ap-
pointment of his successor, and an order thereon that the
suit proceed in the name of the successor. How unlike is
all this to a corporation. A corporation never dies; that
is, if not perpetual, it lives out its known and appointed day.
It has as we have already seen, a *continued existence*, or in
other words, a *continued succession*. A suit in its name
never abates ; for it never dies, resigns or removes. What
sort of a corporation, therefore, must that be, which has not
a *continued existence* by name, so as to have a continued
standing in court?

But again : The statute in respect to suits brought in the
name of or against the president is only permissive. The
language is, " all suits," &c. " *may* be brought," &c ; " all per-
sons," &c. " *may* maintain actions," &c.   Hence, any associ-
ation or individual who is banking under the law may sue
in the name of the association, and the latter, in his own
name. In like manner, any creditor of any such associa-
tion or individual may sue the associates or individual ;
either course would undoubtedly be attended with great dif-
ficulties in respect to parties, when such a suit should be
attempted in favor of or against the members of an associa-
tion, and probably would be impracticable for any useful

Thomas v. Dakin.

end; but still, the right so to sue remains. Here, it may be said, how *entirely* unlike a corporation; there is not even an approach to an analogy. A right to sue in the names of the individual members of a company is an exclusive attribute of a voluntary association; it has not the most distant resemblance to a corporate power.

A suggestion was made by the counsel for the defendant, in the course of his argument, that the statutory provision in the 22d section, that " all judgments and decrees obtained or rendered against such president for any debt and liability of such association, shall be enforced only against the joint property of the association," was analogous to the legal effect of a judgment against a corporation. And so it is; but what of that. Many rights and liabilities of voluntary associations are analogous to those of corporations. The question is, whether it is a peculiar feature of a corporation. If it is, then several other statutory provisions in regard to judgments upon joint liabilities may be said to have the same effect. Our statute declares, that on the arrest of one of several joint debtors, a judgment may be rendered against all, and enforced against the joint property of all. 2 *R. S.* 377. The statutory regulation of suits by and against a limited partnership is, that "suits in relation to the business of the partnership, may be brought and conducted by and against the general partners, in the same manner as if there were no special partners." 1 *R. S.* 766, § 14. The effect of the judgment, of course, is to bind the copartnership property. This legislative enactment, respecting suits by and against limited partnerships, is very similar in form, and cannot be distinguished in substance from that respecting suits by and against the banking associations; and yet, I apprehend, that no one ever seriously thought a limited partnership had any thing in common with a corporation, except perhaps that in chancery, the general partners, as lately held by the chancellor, and the directors of a corporation, are responsible as trustees of their respective common funds. But such responsibility is far too general to be called a peculiar corporate attribute.

THIRD: *Has every association power to take and convey title to property, acquire and give rights as a collective existence, and by its given name or designation?* The parts of the statute supposed to be applicable to this feature of a corporation, are in the twenty-fourth section. That section, after specifying the purposes for which an association may purchase, hold and convey real estate, enacts: "and all conveyances of such real estate shall be made to the president, or such other officer as shall be indicated for that purpose in the articles of association; and which president or officer, and his successors, from time to time, may sell, assign, and convey the same," &c. On comparing this provision of the statute, with what has been said concerning, and in illustration of this third corporate feature, the wide difference will be seen, between a corporation's taking and granting, by its corporate name, and taking and granting in the manner directed by this act. There is no room to doubt, but that every conveyance is to be made to the *person* who fills the office of president, or to some other person who holds some other office in the association. The associates of each association have, therefore, a right of selecting a trustee of their real property from the whole body of their agents, from their president down to their porter. The legislature has not even designated the trustee. They have only said, if you select none for yourselves, then we will select for you, your president; but, as we allow you to elect your president and other officers, we give you unrestricted choice. The right of selection, therefore, is uncontrolled; and is as full, as the right of the members of any voluntary association, to select a trustee for themselves, to take the title to their real property for their benefit. It appears to be so clear, that the associations do not take or grant real estate by their collective name, if they can be considered as having one for any purpose, that it seems unnecessary to spend more time with this branch of the argument.

The next question is, where is the title to the personal property of the associations? The answer is obvious. The

Thomas v. Dakin.

statute having made no provision on the subject, it is where the common law places it, viz: in the members of the respective associations; and subject to such custody, control and management, as they have designated and agreed to, in their respective articles of association. And this shows, that the right, still belonging to the associations, to sue in the names of their members, is no shadow, but a practical reality. The vesting of the title of the real property of the associations in a trustee, who is always selected by themselves; and of their title to their personal property, in the members of the associations, shows how impossible it is, to hold them to be corporations.

FOURTH AND LAST : *Has every association power conferred by the statute to make by-laws, or in other words, to prescribe rules of action for persons without their consent?* The only expression in the statute, which, by the greatest stretch of imagination, can be said to have any relation to this power, is found in the eighteenth section ; that section gives and prescribes the power of the associations, and states it to be, " to carry on the business of banking, by discounting bills," &c., *in the manner specified in their articles of association,* for the purpose authorized by this act. On this part of the subject, it seems sufficient to say, that whatever authority is given to the associations by these words of the act, is merely *permissive,* and that whatever regulations or rules it authorizes the associations to make, such regulations and rules are to be specified in their articles of association ; and, of course, are purely matters of contract, and derive their whole force and authority from the consent of the parties to be bound by them. This, as we have seen, is a feature peculiar to the by-laws of voluntary associations, and distinguishes them from corporations. The by-laws of the latter, deriving their force from the statute, and emanating from the sovereign power, bind those subject to them without their consent ; while those of the former, deriving their force from consent, and emanating from contract, only bind those subject to them with their consent. The very terms employed, show

the difference between incorporated and unincorporated companies; and terms are no unimportant indication of thought. The former is a corporation, the latter a *voluntary* association; the former, exists by force of a statute—the latter, by force of a *contract*; and so their respective by-laws: one binds by *contract*, and the other by *statute*.

In concluding this analysis and examination of the statute, one remark seems to be required in regard to these associations having, in different forms, several of the general powers of corporations. It is true that they have; and so have all citizens of full age, all voluntary associations, and every being, who has and exercises legal rights, and prosecutes judicial remedies. Franchises are rights which can only emanate from the sovereign power, and are generally granted to corporations, but often to individuals and companies not incorporated; and the legislature oftentimes confers the privilege of possessing and enjoying property, and exercising rights, upon persons and associations, not otherwise allowed by law— and such privilege is also generally conferred in the form of an act of incorporation: hence, at an early day, the idea was suggested, that these were incidents to corporations; but they are not peculiar to them, and so it has been decided in England. Lord Holt, in the case of *The King* v. *The City of London, Skin.* 310, held, that neither " the actual possession of property, nor the actual enjoyment of franchises, are of the essence of a corporation:" and this position has received the sanction of Chancellor Kent, in his valuable commentaries. 2 *Kent's Comm.* 277, 2d ed. Had these associations been authorized in the very form they now are, but to carry on some other business than banking, hitherto conducted in this state solely by corporations, it probably would never have entered into the mind of any man to think they were corporations, or even like such bodies, though his ingenuity may have been on the rack, for some plausible ground for a dilatory defence to a just demand.

The statute must be considered as a modified repeal of the restraining act, and in thus repealing it the legislature

Thomas v. Dakin.

have thought proper, and for the very best reasons and most laudable motives, to protect the community from injury, while they restored to every citizen his unquestioned right to use his funds for banking purposes. In doing this, the legislature thought it judicious to require from the associations, full semi-annual statements of their affairs, § 26 *of the act*, as the law then and still requires like annual statements from the incorporated banks of this state, 1 *R. S.* 593, § 19, 20, 3 *id.* 287, § 31, to keep a certain amount of specie on hand, § 33 *of the act*, and other like regulations for the public security ; and these have been alluded to by the counsel for this defence, as showing that the associations are corporations. With equal soundness and cogency might he argue, that because a corporation can maintain a suit in its corporate name, and an individual can maintain one in his name, therefore, a corporation is an individual.

One proposition is self-evident, and although alluded to heretofore, should be distinctly stated in this place, and that is : if these associations are corporations by reason of possessing their essential requisites, they must have *all* those requisites, whatever they are—or in other words, must have the essence of corporations. If there are four *essential* requisites, and they have but three ; or there are three, and they have but two ; or there are two, and they have but one ; they cannot be corporations. On the whole, it is insisted that these associations, judged of solely by the power and attributes given to them by the statute, do not possess the essential requisites of corporations, and, of course, are not, for that reason, corporations. It is admitted, as has already been stated, that they are not so by explicit legislative enactment—and as corporations can only be created in one or the other of these modes, the argument seems conclusive.

But there is yet another and controlling argument against these associations being adjudged corporations, and that is derived from the manifest intention of the legislature. The first evidence of that consists in not only the entire omission of the legislature to declare, by direct and explicit enact-

ment, that the associations shall be corporations, as they have done in every case, without exception, where corpora- tions have been created by special or general acts; but in their caution, manifested throughout the whole statute, to avoid every expression which might countenance such an idea. No person can read this statute and hesitate for a moment in saying, that the legislature never intended to constitute these associations corporations. If they had, how obvious the course. They had only to adopt the forms of some of our other general acts of incorporation; but, in- stead of that, they have studiously avoided all of them. There is a single provision in the law, which of itself is de- cisive of the intention of the legislature—the clause in the nineteenth section, that no association shall "be dis- solved by the death or insanity of any of the share- holders therein." Why such a provision, if these associa- tions are thought or intended to be corporations? But if voluntary associations, then it was pertinent and proper; and like similar provisions often introduced into articles of copartnership and joint stock companies, where there are numerous members, and consequently frequent deaths.

He also contended that the history of the origin, progress and final passage of the act of April, 1838, showed the intention of the legislature, and adverted to legislative documents commencing with a bill on the subject in- troduced 23d February, 1837, and ending with the final passage of the bill now under consideration including the message of the governor recommending action on the sub- ject, the reports of committees, and the opinions of the at- torney-general for the time being. *See Assembly Documents of* 1837, *Nos.* 303, 304, 318; *Senate Documents of* 1837, *No.* 55; *Assembly Documents of* 1838, *Nos.* 2, 122; *Sen- ate Documents of* 1838, *No.* 68. He stated that the bill passed the house of assembly by a vote of 86 to 29. In the senate, after it was ordered to a third reading, a question was taken whether its passage required *a two-third vote*, and it was decided in the negative, by a vote of 17 to 10; and subsequently the bill was *passed* by a vote of 20 to 8.

Thomas v. Dakin.

The second position is, that admitting that the *associations* authorized by this statute are *corporations,* still the statute is constitutional. As the act *must be presumed to have been correctly passed,* that is, by a majority of a quorum of each house, if the bill is a majority bill, and by " the assent of two-thirds of the members elected to each branch of the legislature," if the bill is a two-thirds bill; the question arising under this position is, whether the legislature can pass a law by any vote, majority or two-thirds, authorizing the formation of *an indefinite and unlimited number of bodies corporate,* or in other words, whether the legislature can now provide by a general law, for the incorporation of an unlimited number of voluntary associations, as it could and did, in many instances, before the adoption of the present constitution.

It is admitted by all, that previous to the adoption of the present constitution, the legislature had unquestionable authority to pass general laws of incorporation, and the power had been exercised in five prominent instances, viz : in the passage of " An act relative to the university," passed April 5, 1813, 2 *R. L.* 263, which authorized the incorporation of an indefinite and unlimited number of colleges and academies. " An act to provide for the incorporation of religious societies," passed April 5, 1813, 3, *R. S.* 292, which authorized the incorporation of a like number of religious societies. " An act to incorporate such persons as may associate for the purpose of procuring and erecting public libraries in this state," passed April 1, 1796, 3, *R. S.* 288, which authorized the incorporation of the like number of libraries. " An act to incorporate medical societies, for the purpose of regulating the practice of physic and surgery in this state," passed April 10, 1813, 3 *R. S.* 304, which authorized the incorporation of a medical society in each of the counties in this state. " An act relative to incorporations for manufacturing purposes," passed March 22, 1811, which authorized the incorporation of an indefinite and unlimited number of voluntary associations for manufacturing purposes. The

clause in the constitution, which it is contended has deprived the legislature of the power to pass general laws of incor‑ poration, is in the following words: "The assent of two‑ thirds of the members elected to each branch of the legisla‑ ture, shall be requisite to every bill appropriating the public monies or property for local or private purposes, or creat‑ ing, continuing, altering, or renewing, any body politic or corporate." *Const. art.* 7, § 9. The first proposition contended for on this branch of the discussion is, that this clause in the constitution is not applicable *to a gen‑ eral law, which authorizes all our citizens to unite in companies, and incorporate themselves,* to carry on any business, or manufacture, which the legislature may think can be more usefully and beneficially for the community conducted in that way, than by individual effort; but on the contrary, was intended to apply *to every separate act of incorporation,* which the legislature might thereafter pass, *conferring privileges on a few, to the exclusion of the many;* and thus restrain and impede the granting of monopolies, which are exclusive privileges, and produce inequalities of rights; giving to a few citizens, advantages, which are refused to all others.

The counsel here adverted to an opinion delivered by Justice BRONSON, when *attorney-general* in 1835, upon a call of the *senate* upon a proposed amendment of the *general act* authorizing incorporations for manufacturing purposes, in which he says, "The legislature cannot now provide *by general laws* for the incorporation of volun‑ tary associations, but must *act directly in every grant* of corporate privileges, creating some one or more corpora‑ tions in particular." *See Senate Documents,* 1835, *No.* 4. And he also adverted to an opinion delivered by the late *Attorney-General* BEARDSLEY in 1837, on the call of the *assembly* in respect to the bill of that year, entitled "An act to authorize associations for the purpose of banking," in which, among other things, he says "that the bill is uncon‑ stitutional, as it assumes to authorize the creation of an in‑ definite and unlimited number of bodies corporate, and

should it pass into a statute, and associations be formed un-
der it, they would for the purposes contemplated be abso-
lutely null and void." *See Assembly Documents of* 1837, *No.*
303. After commenting upon these opinions, the counsel ask-
ed, what does the clause in the constitution prohibit? Does
it prohibit the passage of general laws of incorporation? Be-
fore discussing the question on its merits, let us settle the
matter of authority upon the one side as well as the other.
Directly opposed to the above opinions of the gentlemen
holding at the time the office of *attorney-general,* is the
unanimous opinion of the revisers of our statutes, Messrs.
John Duer, B. F. Butler and John C. Spencer. They were
clearly and unequivocally of opinion that this clause of the
constitution did not apply to a *general law* authorizing the
creation of corporations, and that the legislature had the
same power to pass such laws after the adoption of the
present constitution as they had before. They proposed
to revise and amend all the five general laws of incor-
porations above referred to. *See Revisers' Rep. ch.* 15,
*pt.* 1, *tit.* 1, *art.* 2, 3, *Of Colleges; Art.* 4, 5, *Of Acad-
emies; Report of ch.* 18, *pt.* 1, *tit.* 1, *Of Religious Corpo-
rations; Tit.* 2, *Of the Incorporation of Library Societies;
Tit.* 3, *Of Medical Societies,* and *Tit.* 4, *Of Manufacturing
Corporations.* They also proposed an entirely new gene-
ral law of incorporation, authorizing an indefinite and unlim-
ited number of corporations of " obituary societies." *Revis.
Rep. ch.* 18, *pt.* 1, *tit.* 6. The legislature also, which enact-
ed our revised statutes, concurred in opinion with the revi-
sers, and approved and enacted their revision of the general
law authorizing the incorporation of academies, 2 *R. L.*
263; *Revisers' Rep. ch.* 15, *tit.* 1, *art.* 4, 5; 1 *R. S.* 461;
and a subsequent legislature has materially altered and
amended the same act by a majority vote, as the journals
will show. *Statutes of* 1835, *ch.* 34. The thirteenth sec-
tion of the seventh article of the constitution contains a
provision, that all the acts of the legislature of this state
then in force, and such parts thereof as were repugnant
to the constitution, were abrogated. Yet, in the opin-

Thomas v. Dakin.

ion of all, Messrs. Bronson and Beardsley included, not only were our general laws of incorporation then in force unaffected by the provision, but all corporations formed under them since its adoption were in like manner unaffected by it, and were legally and constitutionally incorporated. If the legislature cannot pass general laws of incorporation, on what principle can those already passed be amended or altered ? And if they cannot be altered, they are eternal; and we must be content to have laws that no earthly power can touch, improve or modify. We have also the opinion of Governor Marcy, in opposition to the opinion of Messrs. Bronson and Beardsley. In his message of 1838, before quoted, he says ; " Doubts have been entertained as to the constitutional competency of the legislature to pass a general banking law conferring corporate powers. Without entering into the argument on this question, I will only say, that I am inclined to the opinion, that the legislature have the power to pass such a law ; but the spirit of the constitution requires that it should be passed as a two-thirds bill." He adds, " It is proper, I should also say, that this opinion is entertained with much diffidence, and is not expressed without duly considering the respectful deference justly due to the high authority by which it is opposed." Tested, therefore, by the weight of authority, it must be determined, that the constitution does not apply to general laws, creating, or authorizing the creation of corporations ; and that our legislature may now, as they could before its adoption, pass such laws.

Let us now enquire as to the true construction of the clause of the constitution under discussion.

The first, most usual, and natural mode, is to look into the previous and contemporaneous history of the state, and ascertain the evils which this constitutional provision was intended to guard against for the future. In an uncompromising search for truth, the fact cannot be disguised, that the circumstances, attending and consequent upon the incorporation of the Bank of America on the 2d June, 1812, gave rise principally, if not wholly, to this clause of the constitution. The prorogation of the legislature by the governor

Thomas v. Dakin.

of this state, for the avowed object of preventing the incorporation of that bank by corrupt means; (the vote upon which showed a settled majority of. one in its favor;) the subsequent indictment, for bribing, or attempting to bribe members of the legislature; and the public trial of two individuals who had theretofore stood high in public estimation; been repeatedly honored with offices of high public trust, and both of whom were then in office, and discharging the duties of their respective stations; the alarm which was felt by the community, lest our institutions should fall a prey to a daring thirst of gain, which sought its gratification by corrupting the very fountain of our laws; were all yet held in vivid remembrance. And down to the very time, and during even the session of the convention which framed our present state constitution, the public press was the vehicle of charges, criminations and re-criminations, against many of our public men, for their alleged agency in procuring the charter of that bank; some of whom were members of that convention. And it was probably owing to the circumstance, that the clause underwent so little discussion in the convention as it did, and that Mr. King, the chairman of the committee who reported it, assigned his reasons for its adoption, in brief and general terms. *Debates of Conv. p.* 446. And doubtless to the fact, that some of the individuals, charged with delinquency in regard to the chartering of that bank, and many of their relatives and friends were still on the theâtre of action in this state, is to be attributed, the guarded though still explicit language of Chief Justice Nelson, when speaking of the evil which this clause in the constitution was intended to check, in his opinion, delivered in the case of *The People* v. *Morris*, 13 *Wendell*, 336.

That this section of the constitution owed its origin to the cause mentioned, more evidently appears from the fact, that as first proposed and reported by Mr. King, it only required the assent of two-thirds of the members, " in both houses, to the passage of any *act of incorporation.*" And it was afterwards amended in the convention, by extending

it to acts, " appropriating public monies for local purposes."
*Debates of Conv. p.* 446. Chief Justice Nelson, who was a
member of the convention from Cortland county, has also
added his authority in favor of my position in respect to the
true origin of this constitutional provision. Speaking of the
time when the present constitution was formed, and of the
evil which it was intended to remedy, he says: " But *pri-
vate corporations* had multiplied to an extent that had at-
tracted public attention, especially *banking institutions.*
These had been sought for with zeal, and their enactment
attended with circumstances that awakened public suspicion
and alarm. So extreme had the evil become at one period
of our history, that the chief magistrate of the state felt it
his duty to exercise the power then existing in the constitu-
tion, of proroguing the legislature, and was triumphantly
sustained by the people in the execution of this high and
delicate trust. The fact affords strong evidence of the deep
impression made on the public mind as to these and *simi-
lar* private corporations, and of the scope and purpose of
the clause on this subject. If we resort to the history of its
introduction into the new constitution, the above view will
be confirmed. Mr. King, chairman of the committee of the
legislative department, reported the section ; and when it
came under consideration, said that the committee had
looked upon the multiplication of corporations as an evil ;
they had been created for a variety of purposes ; they were
exceptions to the common law ; they could not be proceed-
ed against in the ordinary way of prosecutions against indi-
viduals in courts of justice.; they ought not to be increased,
but should be diminished as far as could be done consistent-
ly with the preservation of vested rights. It is obvious,
though the language used in the clause in question is gener-
al, that the honorable chairman had in his mind, (and he
spoke for the committee,) the case of private corporations ;
that the great inducements to the adoption of the clause
was a check upon them ; and that the organization of com-
munities, and the investing them with the privileges of mere
municipal jurisdiction and authority, were not at all in con-
templation." *The People* v. *Morris,* 13 *Wendell,* 336, 337.

Thomas v. Dakin.

It will be observed that the chief justice in speaking generally of the evils which the constitution intended to remedy, remarks, " *Private incorporations* had multiplied to an extent that had attracted public attention, especially *banking institutions.*" A recurrence, however, to the history of the times will show that the idea of a repeal of the restraining act, or the passage of a general law of incorporation for banking purposes, was the fartherest possible from the mind of the convention. That no one at that day, even in his wildest dreams, thought of opening the business of banking to all our citizens. The evil that pressed the convention and the public was, the frequency of the enactment of separate acts of incorporation, each of which thronged our capitol and legislative halls with their agents, who found their reward in obtaining exclusive privileges, principally for banking, which were withheld from our citizens generally. Opening at once, to a whole community, the business of banking, *allowing all to bank who choose, is a very different measure,* rests on entirely different principles of policy, and must be followed by entirely different results, from increasing from time to time, under a strong external pressure upon the legislature, stimulated by individual interest, *private and exclusive corporate privileges for banking.* Nothing more clearly shows the difference between the two, than the history of the enactment of our present general banking law, and of the separate incorporation of the other banks of the state. Nor does any thing more satisfactorily prove the certainty of the overthrow of the banking monopolies of this state, and the suppression of their spirit, than the early, steady, active and persevering opposition of the holders of the exclusive charters, to the new general system.

The debates of the convention, though very brief, general and unsatisfactory, also show that the evil aimed at, was the multiplication of monopolies—partial and unequal laws—exclusive privileges, which benefit a few to the injury of the many. *Debates of Conv.* 446.

As there never was any complaint against the corporations created under general laws, there would seem, there-

fore, to be no doubt, but that this provision in the constitution was intended to remedy the evil of partial legislation, and to remove the temptations to corruption which such a course of legislation necessarily draws after it. The obvious and natural remedy was the one adopted, viz : not to allow the enactment of a law, either " appropriating the public monies or property for local or private purposes ;" by which the few would be benefitted at the expense of the many ; or " creating, continuing, altering or renewing any body politic or corporate," by which privileges would be conferred on a few, to the exclusion of the many, by the vote of a bare majority ; but that when either of those objects were sought through the agency of the legislature, it should be so clear a case, that two to one should be in favor of it ; and besides, if another case like the Bank of America should occur, in which the applicants for an exclusive privilege should be so reckless in regard to the means of effecting their object, as to use the criminal and subduing power of gold, they should be compelled to conquer two-thirds of all the members elected to each branch of the legislature— a much more difficult, hazardous and expensive enterprise, than drawing into their interest a bare majority of each house. There was at that time, and still is, only two modes of legislation known or understood for incorporating companies. One, by a general law, allowing all who choose, to take an act of incorporation for conducting a particular business or trade ; the other, by a special act, incorporating a single and specific company. Is it not then obvious that this clause in the constitution, so far as it relates to corporations, was intended to apply to that mode of corporate legislation, by which one act incorporated a single and separate company, and *not* to general laws, conferring the same privileges upon and affecting all our citizens alike.

Although Governor Marcy's remark, in his message of 1838, that the spirit of the constitution required that a general banking law should be passed as a two-thirds bill, was made, as he said, with much diffidence, his high political and judicial standing demands a notice of it. He appears to have made the remark, without recurring to the origin and

cause of the constitutional provision ; or to the two modes of corporate legislation then in use.  He makes the remark apparently under the general  impression that banking institutions are within the spirit of the clause, without reflecting upon the great difference between opening banking to all and restricting it to a few ; or that a general banking law, conferring corporate powers, is no more within the spirit of the constitution, than a general manufacturing law ; a general insurance law ; a general whale fishery law ; or any other general law conferring like powers,  If *one* general law, creating corporations for a  particular purpose, is within the constitution, then *every other* general law, conferring corporate rights for whatever purpose, is also within it,  Had the governor looked at the question in all its bearings and effects, he would have concurred with the revisers of our statutes, in this particular, as he did in the more general proposition, that the legislature had the same power now, as before the adoption of the  constitution, to pass general laws of incorporation ; and that the restrictive clause was only applicable to private and exclusive legislation.

The language of the constitution fairly and naturally indicates and covers this special legislation.  It is : " The assent of two-thirds of the members elected to each branch of the legislature, shall be requisite ot every bill  appropriating the public monies  or property for local or private purposes, or creating, continuing, altering or renewing, any body politic or corporate."  Does not the section, tested by its language, apply, and only apply to that mode of creating corporations, then in general use, by a separate act for each incorporation ?  The assent required  shall be  " to *every* bill," &c. " creating," &c. *any* body politic  or corporate."  The language indicates separateness and directness of legislation; and must be strained to embrace general laws and  indirect incorporation.

It is not insisted that if a law incorporates more than a single company, it is not therefore embraced by the constitution.  The plaintiff contends for the great and manifest distinction, between general and private legislation ; between a law that confers the same privileges on

all, and one which confers privileges on a few to the exclusion of the many. It may be difficult to mark the exact line; but not more so, than to determine the old line between public and private acts; between internal improvements for general, and those for local benefit; and between bills appropriating public monies for local and private purposes, and those appropriating them for general purposes. There is a broad distinction between them founded on reason and principle. One is and the other is not within the evil provided against. One is and the other is not within the letter or spirit of the constitution.

The framers of the constitution were well aware of our *general laws of incorporation* and of the frequency with which they were passed. Some of them were even alluded to in the few remarks made in convention on adopting the restrictive section. Had it been the intention of the convention to include within this provision of the constitution *general laws of incorporation,* would not other and appropriate language for that purpose have been used? and especially, if the convention had intended to prohibit altogether the passage of any more general laws of incorporation, either by a majority or two-thirds vote; (for let it be kept steadily in mind, that that is the position contended for by our opponents and sanctioned by the opinion of Messrs. Bronson and Beardsley;) would not other language have been used? would not another and a distinct section have been introduced into the constitution? The manifest object of this section was to declare *by what vote,* certain laws thereafter should be passed, and not *what laws* should or should not be thereafter passed. Besides; if the convention had supposed that the effect of this section would be entirely to prohibit thereafter the passage of all general acts of incorporation, there would certainly have been opposition; the policy of the measure would at least have been doubted by many; a debate, and a full and protracted one, would have ensued. The public would have been alarmed by such a proposition, and the press would doubtless have been heard. And had the convention intended to prohibit the passage of general laws of incorporation for conducting the business of

*banking*, or insurance, or any other trade or business, would there not have been in the constitution an appropriate clause? or had the convention intended to do any thing except regulate the mode of legislation in respect to the vote to be given, would they have left their intention in doubt?

Seeing then, that the language of the section does not call for, but on the contrary repels the construction claimed by the counsel for the defendant; seeing also that it was not the intention of the framers of the constitution to prohibit thereafter the enactment of general laws of incorporation, should the light of experience induce this tribunal to extend this constitutional provision by construction beyond the natural and fair purport of its language.

It cannot be deemed rash to assert, that if this section of the constitution could be submitted now to the people of this state, it would be repealed almost unanimously. Instead of promoting purity in our legislation, or restraining exclusive and unequal grants of corporate privileges, it has the directly opposite tendency, by enabling a few members in each branch of the legislature to control its action, and thus force through the forms of legislation, many measures, as unjust as they are unwise. Mr. Beardsley, in his opinion, uses strong language on this subject. He says: "The restraint imposed by the constitution may be an unwise one, and unsuited to the present condition and wants of the community. It may have been imposed without adequate cause, and have proved to be illusory and mischievous. These are all possible." It may be added that *they are all true*; and that such is the opinion of this community. The report of the committee of the senate, made in 1837, from which extracts have already been given for another purpose, holds the bold and direct language of truth on this subject, and shows the lamentable and humiliating influence which this provision of the constitution has had in practice on our legislation.

The question then arises, is it the duty of this court to extend this constitutional provision by construction; or, is it rather their duty to restrict its influence? The answer is obvious.

There is a single other idea which ought to be stated in this connection ; and that is, that there is no danger from any source, in permitting a legislature to legislate for the general benefit of the community, which must always be the case, with all general laws of incorporation. They create no distinctions; they confer no exclusive privileges ; they benefit all alike. Such a power, surely, ought not to be taken from our legislature, by implication or construction.

This court, in the case of *The People* v. *Morris*, 13 *Wendell*, 325, decided, that laws, both general and special, incorporating or altering the acts of incorporation of our cities and villages, were not within the operation of this clause of the constitution, and might be passed by majority votes ; although it was admitted that they were within its letter. The great principle on which this decision rests, is that these corporations, being bodies politic, were created for the general benefit of the community, and were not within the evil intended to be remedied by this constitutional provision, and that it would be dangerous, and could not have been intended by the convention " to restrict the action of the legislature in the municipal regulations of the state." The chief justice thus expresses himself : " Are they within the evil this provision was designed to remedy ? No one, I think, acquainted with the history of the times, or with the introduction of this clause into the constitution, will venture upon this ground. It may be fortunate for truth, and what is deemed a sound exposition of this provision, that all who may desire to examine it, can recur to his own recollection, and challenge that of others upon this point. We think we hazard nothing in asserting, that the multiplication of cities, or villages by the legislature has at no time been a subject of complaint." *Id.* 336. How fully and forcibly this language covers the whole ground occupied by the present discussion. Who, acquainted with the history of the times, will venture to assert, that the passing of general acts of incorporation has at any time been the subject of complaint. As such acts were not within the evil intended to be remedied, they should be excluded

Thomas v. Dakin.

from the operation of the constitutional restriction, even if within its words, on the principle of the decision just cited ; *a fortiori*, they should be excluded, not being within its words. This great principle has been acted upon in this state ever since the adoption of the present constitution, in respect to bills "appropriating public monies or property for local or private purposes." Our legislation has been uniform in passing bills of this kind by the ordinary majority vote, where the benefit was general, though the appropriation was confessedly local.

This branch of the argument is concluded by stating the answer to the question proposed, viz: that this constitutional provision is not applicable to general acts of incorporation, and that the legislature can pass a law by any vote, majority or two-thirds, authorizing the formation of an indefinite and unlimited number of bodies corporate ; or, in other words, that the legislature can now provide by a general law for the incorporation of an unlimited number of voluntary associations, as it could and did in many instances before the adoption of the present constitution.

But if the court is not fully satisfied with this conclusion, one other rule of construction is submitted, applicable to these great constitutional questions ; a rule founded in the purest wisdom, and supported by the highest authority. It is, that no statute should be declared unconstitutional, unless it is *clearly and unquestionably* a violation of the constitution. This court, in the case of *ex parte M'Collum*, 1 *Cowen*, 564, said : "Before the court will deem it their duty to declare an act of the legislature unconstitutional, a case must be presented in which there can be no rational doubt." And the supreme court of the United States, in the case of *Dartmouth College v. Woodward*, 4 *Wheat.* 625, held, "that in no doubtful case would it pronounce a legislative act to be contrary to the constitution." If, then, the argument which has been presented has failed to produce conviction, and only brought the court into doubt, as to the constitutionality of the statute, that doubt must be resolved in favor of its validity ; and thus protect the immense amount of property

invested under its sanction, and secure to the community the great benefits which have and must flow from its enactment.

The third and last position is, that admitting that the constitutional restriction is applicable to general acts of incorporation, then it is insisted that such a law may be passed by a two-thirds vote, and that this law will be presumed to have been so passed.

One of the propositions stated, and it is trusted satisfactorily proved, in the course of the argument in support of the second position is, that the constitutional provision was only intended to prescribe the *vote* by which each act should be passed, which appropriated public moneys to local or private purposes, or created or altered any body politic or corporate, and left every thing else to the discretion of the legislature. The only question remaining is, whether this court is not bound to presume that this, as well as every other act of the legislature which has passed through the office of the secretary of state to the state printer, and been published according to law, has been constitutionally passed ; or, in other words, whether this court can inquire beyond the certificate of the secretary of state, and institute an investigation respecting the manner in which any given law has passed the legislature ? Our statutes declare : " He (the state printer) shall print, in volumes of octavo size, so many copies of the laws of each session, with the concurrent resolutions and indexes that shall be delivered to him for that purpose, by the secretary of state, and shall be annually directed by the secretary, who shall also revise and correct the proof sheets." 1 *R. S.* 148, § 10. " All laws passed by the legislature, may be read in evidence from the volumes printed by the state printer, in all courts of justice in this state, and in all proceedings before any officer, body, or board, in which it shall be thought necessary to refer thereto." *Id.* 148, § 12. " The secretary of state shall receive every bill which shall have passed the senate and assembly, and have been approved and signed by the governor, or which shall have become a law notwithstanding the objections of the governor, or which, not having

Thomas v. Dakin.

been returned by the governor within ten days, shall have become a law ; and shall deposit such laws in his office." *Id.* § 10. " He shall certify and endorse upon every such bill, the day, month and year, when the same so became a law, and such certificate shall be conclusive evidence of the facts therein declared." *Id.* 157, § 11. " No bill shall be deemed to have passed by the assent of two-thirds of the members elected to each house, unless so certified by the presiding officer of each house." *Id.* 156, § 3.

It has been supposed by some, that two-thirds bills must have the certificate provided in this last section attached to them, or they are not valid. This has never been the practical construction put upon the section, as such certificates have not been published with the two-thirds acts, which they would have been, if they were considered essential to the validity of those acts. The object of the certificate would appear to be, that, for which it has heretofore been used, to apprise the governor how the act has been passed, that he may understandingly exercise his power of veto. For if, in his opinion, a two-thirds bill has been passed by a majority vote, it is undoubtedly his duty to withhold his approval. Other sections of the statute appear to indicate this, as the object of the certificate. The fourth section is in these words : " Every bill thus passed and certified, must, before it becomes a law, be presented to the governor ; if he approves, he must sign it ; and he shall endorse thereon a certificate of his approbation, and deliver the same so endorsed to the secretary of state." 1 *R. S. p.* 157, § 4. By this section, when the governor approves a bill, he must endorse on it a certificate of his approbation, and deliver it to the secretary of state. His certificate, it would appear, is the evidence on which the secretary of state is to make his certificate, as directed by the eleventh section above quoted. If the governor does not approve a bill, and it is afterwards passed by two-thirds of the members present in each house, the presiding officer of each house must certify the vote thereof on the bill, and the presiding officer of the house which last passes it must deliver the bill so certified to the secretary of state. *See*

1 *R. S.* 157, § 5, 6, 7. These certificates appear to be the only authentication in such a case, on which the secretary of state acts in endorsing his certificate. If we give to the certificates, which the third section requires upon two-thirds bills, the same force and effect which are given to the certificates required upon bills disapproved by the governor and afterwards passed by two-thirds present, they *then* are no more than authentications upon which the secretary of state acts when he endorses his final certificate; and certainly they can be entitled to no greater force, nor furnish and higher evidence of legislative action. At all events, they are acts anterior to the act of the secretary of state, which the statute declares, shall be *conclusive* of the month and year when the bill becomes a law. Does not this *necessarily* shut out all inquiry beyond the certificate of the secretary of state? And ought it not to do so? The consequence of permitting an investigation before a jury, of the circumstances under which a law was passed, for the purpose of ascertaining whether it had been constitutionally passed, or, in other words, whether the members of the legislature had kept their oaths of office, and regarded the constitution, would seem to be dangerous, and certainly would in many cases be unjust, and might be fatal to the public.

The constitution declares, that " a majority of each house shall constitute a quorum to do business." *Const.* § 3. 1 *R. S.* 43. The presence, therefore, of a majority is essential to the transaction of any business, and especially to pass a law. This constitutional requirement is just as explicit and binding, as the one which requires the assent of two-thirds of the members elected to each house to a two-thirds bill. If our courts of law may inquire, by a jury, how a two-thirds bill was passed, in the like manner they may inquire how a majority bill was passed; and thus statutes, which may have been rules of action for years, and under which large amounts of property have been vested, and numerous titles taken, may be in effect abrogated by a court and jury, and declared void. Can a principle, with such a consequence, be tolerated? The mere statement of it produces its con-

demnation. If there is no reason for it to rest upon, much less is there any authority. I presume such an extraordinary investigation has never been witnessed in any country, where the distinction is recognized between statute and common, or written and unwritten law. Besides, every bill, after being endorsed by the secretary of state, as required by the statute, is filed in his office, and becomes a *record.* A record imports verity, and can only be tested by itself. As a general rule, no enquiry *in pais* is permitted which may destroy it : it stands or falls by itself. This rule so just and reasonable, should secure us from exposure to the hazard of losing the protection of statutes we have lived under for years. This point, it is true, does not directly arise on these pleadings, but a full discussion of the subject required its consideration.

The following opinions were delivered :

" By Chief Justice NELSON. This is an action brought by the plaintiff, as president of the Bank of Central New-York, an association formed under what is familiarly known as the General Banking Law, passed April 18, 1838, to recover several demands due the institution.

The defendant has demurred to the declaration, and urges the unconstitutionality of the law by way of defence ; and it is insisted, in his behalf : 1. That the associations formed under this law are *corporations ;* and 2. That a general law authorizing the creation of these bodies, is inconsistent with the ninth section of the seventh article of the constitution. On the part of the plaintiffs, it is urged in reply : 1. That the associations are not corporations ; 2. That if they be, the act authorizing them may be passed by a majority *bill ;* and 3. If within the ninth section, still the law may be passed by two-thirds of the members elected.

Are these associations corporations ? In order to determine this question, we must first ascertain the properties essential to constitute a corporate body, and compare them with those conferred upon the associations ; for if they exist in common, or substantially correspond, the answer will

be in the affirmative. A corporate body is known to the law by the powers and faculties bestowed upon it, expressly or impliedly, by the charter; the use of the term *corporation* in its creation is of itself unimportant, except as it will imply the possession of these. They may be expressly conferred, and then they denote this legal being as unerringly as if created in general terms. It has been well said by learned expounders, that a corporation aggregate is an artificial body of men, composed of divers individuals, the *ligaments of which body are the franchises and liberties bestowed upon it,* which bind and unite all into one, and in which consists the whole frame and essence of the corporation. The "franchises and liberties," or, in more modern language, and as more strictly applicable to private corporations, the *powers and faculties,* which are usually specified as creating corporate existence, are: 1. The capacity of perpetual succession; 2. The power to sue and be sued, and to grant and receive in its corporate name; 3, To purchase and hold real and personal estate; 4. To have a common seal; and 5. To make by-laws. These *indicia* were given by judges and elementary writers at a very early day: since which time the institutions have greatly multiplied, their practical operation and use have been thoroughly tested, and their peculiar and essential properties much better understood. Any one comprehending the scope and purpose of them, at this day, will not fail to perceive that some of the powers above specified are of trifling importance, while others are wholly unessential. For instance, the power to purchase and hold real estate is no otherwise essential than to afford a place of business; and the right to use a *common seal,* or to *make by-laws,* may be dispensed with altogether. For as to the one, it is now well settled that corporations may contract by resolution, or through agents, without seal; and as to the other, the power is unnecessary, in all cases where the charter sufficiently provides for the government of the body. The distinguishing feature, far above all others, is the capacity conferred, by which *a perpetual succession of different persons shall be regarded in the law as one and the same body, and may at all*

Thomas v. Dakin.

*times act in fulfilment of the objects of the association as a single individual.* In this way, a legal existence, a body corporate, an artificial being, is constituted; the creation of which enables any number of persons to be concerned in accomplishing a particular object, as one man.' While the aggregate means and influence of all are wielded in effecting it, the operation is conducted with the simplicity and individuality of a natural person. In this consists the essence and great value of these institutions. Hence it is apparent that the only properties that can be regarded strictly as essential, are those which are indispensible to mould the different persons into this artificial being, and thereby enable it to act in the way above stated. When once constituted, this legal being created, the powers and faculties that may be conferred are various—limited or enlarged, at the discretion of the legislature, and will depend upon the nature and object of the institution, which is as competent as a natural person to receive and enjoy them. We may, in short, conclude by saying, with the most approved authorities at this day, that the essence of a corporation consists in a capacity: 1. To have perpetual succession under a special name, and in an artificial form; 2. To take and grant property, contract obligations, sue and be sued by its corporate name as an individual; and 3. To receive and enjoy in common, grants of privileges and immunities.

We will now endeavor to ascertain with exactness the powers and attributes conferred upon these associations by virtue of the statute. The first fourteen sections (1 to 14) prescribe the duties of the comptroller in furnishing notes for circulation, taking the required securities, &c. The 15th provides, that any number of persons may associate to establish offices of discount, deposite and circulation. The 16th, that they shall make and file a certificate, specifying: 1. The *name* to be used in the business; 2. The *place* where the business shall be carried on; 3. The *amount* of capital stock, and number of shares into which divided; 4. The *names of the shareholders*; 5. The *duration* of the association. The 18th confers upon the persons thus associating, the most ample powers for carrying on banking operations,

together with the right " to exercise such incidental powers as shall be necessary to carry on such business; also to choose a president, vice president, cashier, and such other officers and agents as may be necessary. By the 21st and 22d sections, contracts, notes, bills, &c. shall be signed by the president and cashier; and all suits, actions, &c. are to be brought in the name of, and also against the president for the time being; and not to abate by his *death, resignation* or *removal*, but to be continued in the name of the successor. 24th section: The association may purchase and hold real estate, &c. the conveyance to be made to the president, or such other officer as shall be designated, who may sell and convey the same free from any claim against shareholders. 19th section: The shares of capital stock to be deemed personal property, transferrable on the books of the association; and every person becoming a shareholder by such transfer, shall succeed to all the rights and liabilities of the prior holder. 23d section: No shareholder to be personally liable; and the association is not to be dissolved by the *death* or *insanity* of any shareholder.

1. Upon a perusal of these provisions, it will appear that the association acquires the power to raise and hold for common use any given amount of capital stock for banking purposes, which, when subscribed, is made personal property, and the several shares transferrable the same and with like effect as in case of corporate stock; to assume a common name under which to manage all the affairs of the association; to choose all officers and agents that may be necessary for the purpose, and remove and appoint them at pleasure. It will hence be seen, that although the association may be composed of a number of different persons, holding an interest in the capital stock, its operations are so arranged that they do not appear in conducting its affairs; all are so bound together, so moulded into one, as to constitute but a single body, represented by a common name, or names, (the knot of the combination,) and in which all the business of the institution is conducted by common agents. In this way it purchases and holds real and personal property, contracts obligations, discounts bills, notes and other evidences

Thomas v. Dakin.

of debt, receives deposites, buys gold · and silver bullion, bills of exchange, &c., loans money, sues and is sued, &c. It is true, some portion of the business is conducted in the assumed name, and some in the name of the president for the time being ; but this in no manner changes the character of the body. A corporation may have more than one name ; it may have one in which to contract, grant, &c., and another in which to sue and be sued ; so it may be known by two different names, and may sue and be sued in either ; and the name of the president, his official name, or any other, will answer every purpose. 2 *Bacon's Abr.* 5. 2 *Salk.* 451. 2 *id.* 237. *Ld. Raym.* 153, 680. The only material circumstance is, a name, or names, of some kind, in which all the affairs of the company may be conducted. So much, and no more, is essential to give simplicity and effect to the operation. An artificial being is thus plainly created, capable of receiving all the ample powers and privileges conferred upon the associations, and of managing their diversified concerns in an individual capacity. All business is to be conducted in a common or proper name.

2. This artificial being possesses the powers of perpetual succession. Neither *sale* of shares, or *death* of shareholders affect it ; if one should sell his interest, or die, the purchaser or representative, by operation of law, immediately takes his place. § 19. Nor can the insanity of a member work a dissolution. *Id.* Officers and agents for conducting the business of the association are secured. In case of vacancy, by death or otherwise, the place may at once be filled. § 18. For the entire duration, therefore, of the association, and which may be without limit, § 16, *sub.* 5, the whole body of shareholders, though perpetually shifting, constitute the same uniform, artificial being which is to be engaged through the instrumentality of officers and agents in conducting the business of the concern, and no member is personally liable. § 23. Then, as to the powers conferred, without again specially recurring to them, it will be seen at once that the associations possess all that are deemed essential, according to the most approved authorities, to constitute a corporate

body. They have a capacity: 1. To have perpetual succession under a common name, and in an artificial form; 2. To take and grant property, contract obligations, to sue and be sued by its corporate name, in the same manner as an individual; 3. To receive grants of privileges and immunities, and to enjoy them in common. All these are expressly granted, and many more, besides the general sweeping clause, " *to exercise such incidental powers as shall be necessary to carry on such business,*" (meaning the business of banking,) under which even the seal and right to make by-laws are clearly embraced, if essential in conducting the affairs of the institution.

II. Assuming that the associations are to be regarded as corporate bodies, was it competent for the legislature to enact the law by a *majority bill?* The solution of the question depends upon a construction of the ninth section of the seventh article of the constitution, which, leaving out what is not material, is as follows: " The assent of two-thirds of the members elected to each branch of the legislature, shall be requisite to every bill" " *creating,* continuing, altering or renewing any body politic or corporate." Before the adoption of the constitution, (1822,) corporations were formed: 1. Under general laws; and 2. Under particular statutes. The former were confined to a few specified cases, such as religious societies, colleges, academies, &c. It has been strongly urged for the plaintiff, that the above clause was intended to apply exclusively to the latter mode; and that a general law may still be passed by a majority. The proposition is undeniable, that the object of the clause was to check the undue multiplication of these bodies; this was the prevailing evil complained of, and aimed at. The particular powers and privileges that had been conferred upon those already existing, were not deemed disproportioned to the purposes for which they were created. Nor was it denied but that they were frequently useful, if not necessary, in enabling comparatively small capitalists to combine, and thus co-operate with larger ones, in the various public enterprises of the day, for the amelioration and improvement of the condition of the country, and the developement of her capac-

Thomas v. Dakin.

ity and resources. But they were sought from the legislature for objects not called for by these considerations, and in numbers disproportioned to the public wants. The latter was emphatically true in respect to banking institutions. Upon this view, it is most manifest that the construction contended for by the plaintiff, would operate as a virtual repeal. It removes at once all the force of the restraint—in an aspect of the case, too, in which, above all others, it should be brought most strongly to bear, if we are influenced by the considerations which suggested it. If the convention feared the undue multiplication of these institutions from particular statutes, much more might they from general laws, under which they might be created in unlimited numbers at will. The force of this view was felt upon the argument; and the counsel attempted to evade it by assuming that the great evil existing, and at which the clause aimed, was not so much the multiplication of corporations, as the grant of exclusive privileges which the general law avoided. Even were we to concede the premises, the conclusion would not follow. Practically, and for every business purpose, exclusive privileges are still conferred. Comparatively few citizens, in the nature and condition of things, can associate and participate in the enjoyment of the grant. The business requires capital, skill, confidence, &c. The framers of the law well knew all this, and could not have been influenced by the expectation that all would become members of banking associations. So far as the enjoyment of exclusive privileges by the few are unjust and hurtful to the many, the evil is not removed, and practically never can be, by the general law. Its bad effects may be modified through its action upon the business of the country, by means of the competition of the several associations—nothing more. But the great error of the argument consists mainly in regarding an incident or circumstance that enhances the injurious effect of the evil, as the evil itself. The mere exclusiveness of privileges alone, against which the clause is supposed to be directed, can be of but little concern. Their injurious influence depends: 1. Upon their nature and extent; and 2. Upon the objects and pur-

Thomas v, Dakin.

poses for which bestowed; They may be granted extravagantly, in proper cases; and are prejudicial when even sparingly bestowed for improper objects. The privileges under a general law may be unreasonable in number and degree, as well as under particular statutes; and the object of them such as is calculated seriously to interfere with private and public rights. Guarding them against the mere exclusiveness of privileges, and not against their extent and purpose, would have been but an idle restraint. In every view, it will be found that the policy of the clause applies as strongly to the general as to the particular laws.

It was further urged, that the general laws for the incorporation of religious societies, &c. existing at the adoption of the constitution, and since continued in force, could not be sustained if the one under consideration failed. Not so. They were not abrogated by that instrument: the thirteenth section of the seventh article only abrogates " such of the said acts, and parts thereof, as are (were) repugnant to the constitution." These were not repugnant, any more than existing charters. The ninth section, the only one bearing at all on them, is prospective, and operated only upon future legislation, leaving in full force all existing laws on the subject.

III. May this general law be constitutionally enacted by the assent of two-thirds of the members elected to each branch of the legislature ?

Two different constructions of the ninth section are claimed. For the defendant it is urged, that according to its true intent and meaning, *each corporation* thereafter to be created by the legislature must receive the *direct assent* of two thirds of the members elected : While for the plaintiff it is insisted, that the provision is fairly complied with, when the assent of two-thirds is given to a general statute, establishing a system for the admission of voluntary associations to corporate privileges : in other words, when the assent is *indirectly* given to the creation of each. If we regard the clause as intended to check the undue multiplication of these bodies, it is quite clear that the former interpretation will most effectually attain the object. It secures a perpetual restraint upon their creation, both in respect to the delibera-

tion and judgment to be bestowed, as well as to the assent to be given in each particular application : whereas in case of a general law, when once enacted, all further check upon the legislature is at an end. The latter interpretation, how- ever, cannot be said to be ineffectual. It gives full scope to the clause in respect to all the legislation essential to the creation of such bodies : none can claim existence, except by a law passed in obedience to its injunction. The check operates upon the grant of corporate powers to each, but with diminished force. The material difference betwixt the two constructions consists mainly in the mode of applying the restriction to the action of the legislature : the one necessa- rily making it bear directly upon the grant of privileges ; the other, only through an established system of law devised for the purpose.

Recurring to the section, § 9, it will be seen, that the words descriptive of the nature and character of the " bill," and which distinguishes it as falling within the restriction, only import one " creating" " any body politic or corporate." How or in what mode the " bill" shall create them—what shall be its particular provisions—whether it must create directly, or may do so indirectly, is not prescribed, and of course must depend upon the construction to be given to it. One thing it secures in terms, that however the " bill" may be framed, if it creates a corporation, it can pass only by two-thirds. Hence it may be argued with considerable ef- fect, that the framers of the constitution did not intend to restrict the discretion of the legislature in respect to the form and provisions of the bill, its particular arrangement and detail : whether it might or might not embody provisions creating one or more corporations at the same time, or pro- vide for their creation at will for specified objects upon cer- tain stipulations and conditions to be first complied with ; but that they intended simply to inhibit the passage of what- ever bill might be devised, creating directly, or indirectly, these institutions. This view presents, undoubtedly, the strongest ground upon which the construction contended for by the plaintiff can be placed. The contrary one, beside giving greater force and effect to the clause, it must be ad-

mitted is not altogether destitute of support from the phraseology.

To create a corporation " by bill," would seem naturally enough to require that the bill should purport, on the face of it, to create one ; that the corporate body should be the direct result of its enactment into a law ; and there is plausibility in saying, that one formed by voluntary association under a general statute, is not created " by bill." But the section should be construed to mean the same as if the phrase " by law " had been used instead of " by bill," for the bill cannot be said to create any thing till passed into a law ; it is the law, not the bill, properly speaking, that creates the corporation, and the latter term is obviously used in the same sense with the former. The clause would then read thus : " The assent of two-thirds," &c. " shall be requisite to every *law* creating," &c. Now, though it might at first strike the mind somewhat absurdly to contend that these corporations thus created under a general statute, are created by bill within the words of the constitution, yet when we fix upon the obvious meaning of the term, the difficulty, in a measure, disappears : for it must be admitted that corporations formed under the general act are created by law. All the powers and privileges possessed, and which constitute the corporate body, are derived directly from it. The association itself is a nonentity : it receives all its vitality from the law, and is, emphatically, the *creature* of it. What adds considerable force to this view is, that unless we hold those thus constituted to be created by bill within the meaning of the constitution, it will be impossible, upon consistent reasoning, to bring any statute, even one purporting to create them, directly within the restriction : for even in that case, the bill or law does not create one absolutely and by its own force, any more than this general statute. Some act is still necessary to be done by the persons intended to be incorporated ; they must, at least, assent to the terms prescribed, and frequently first perform onerous stipulations and conditions. The legislature cannot compel a citizen to be a private corporator ; it is his concurrence and performance of the conditions, if any, that gives to the law all its

effect. 4 *Burr.* 2200.   3 *T. R.* 240.   1 *id.* 575.   2 *Mass.*
*R.* 279.   The most that can be said, therefore, in endeavor-
ing to distinguish this statute from particular acts of incor-
poration, is, that the conditions and stipulations to be per-
formed preliminarily to corporate existence under the one,
will usually be more numerous and important than those
under the other.   They are alike indispensable in both cases.
The difference consists in the nature and amount of the acts
to be performed, not in the principles upon which the corpo-
ration is constituted.   In neither case is it created absolutely
by the bill or law, but in each upon consent and performance
of the conditions of the grant by the corporators.   An illus-
tration of the force and correctness of this view may be seen
by a reference to the course of legislation in cases of partic-
ular acts of incorporation.   Charters for building rail or
macadamized roads, canals, turnpikes, &c. often simply pro-
vide that certain commissioners may open books for sub-
scriptions to stock ; and when a given amount is raised, the
subscribers shall assemble and elect directors, who are em-
powered to conduct all the affairs of the company, and are
clothed with the necessary powers for the purpose.   Several
charters like the above will be found on the statute book,
and their constitutionality is not questioned.   Bank charters
may be granted in the same manner ; and it appears to be
conceded that any number of them may be embraced in the
same bill.   If it be said that the place of business of each
institution being fixed, the legislature will still be enabled to
determine upon the propriety of the several grants, the sub-
ject matter of the applications being thus brought directly
under the exercise of their judgment ; it may be answered,
that even the *place of business* may be left to the discretion
of the directors to be chosen, as it will not be pretended
that there is any thing in the constitution forbidding this
delegation of power.

Then we have a bill embracing an indefinite number of
banks without restriction as to the persons upon whom the
privileges and powers are conferred, or as to the places
where the institutions are to be carried on, and which con-
fessedly, (if any number may be included, which I do not

Thomas v. Dakin.

see can be denied,) may be enacted into a law by two-thirds. It is obvious that corporations thus created, do not differ very materially from those formed under the general law, either in respect to the mode in which they come into existence, or to the operation of the constitutional check upon the legislature. The practical difference would be found more remarkable for perplexing and embarrassing legislation over the subject, in case the construction contended for by the plaintiff be maintained, than in securing a more effectual restraint upon the powers of this body. For, though their assent would be direct in the grant of corporate powers to each, still, if there may be an indefinite number embraced in the bill, without restriction as to persons or places of business, their means of exercising a sound discretion upon the subject matter, would afford but few, if any, advantages, over those to which they have access in the more enlarged consideration of it, when deliberating upon the propriety of establishing a general law under which the institutions may be created by voluntary association. But, leaving out of the discussion the idea that has been suggested, that any number may be embraced in one bill, and taking the most restricted construction contended for, the argument is brought down to the single question which has already been stated, namely, whether the assent of two-thirds required by the 9th section must be *directly* given to each particular grant, or may not be *indirectly* through an established system of law for the creation of corporations, as in the case before us? The words of the clause, it is admitted, are not decisive upon either view; and their legal import not free from doubt and difficulty, as I think has been shewn. In such a case I agree that the court ought not to pronounce the statute unconstitutional. The opinion of the legislature is entitled to great consideration and the highest respect upon the question ; and in a case of serious or reasonable doubt may be safely admitted as controlling. When it clearly oversteps its bounds, the judicial authority may be effectually invoked and their acts annulled ; and in such cases, I trust, it will always be found ready to do its duty. This will afford every necessary protection to the citizen and other departments of the government.

Thomas v. Dakin.

Upon the whole, I am of opinion: 1. That these associations are corporations; 2. That the legislature possesses no power to pass a general law like the one under consideration by a *majority bill*; and 3. That they may pass it by *two-thirds* of the members elected.

The plaintiff is therefore entitled to judgment on the demurrer, with leave to amend on the usual terms.

By Cowen, J. The plaintiff declares as president of the Bank of Central New-York, an association formed under the general banking law of April, 18, 1838, in assumpsit on a debt which he avers to be due to " The Bank of Central New York," the name of the institution, not to the members of the association jointly, naming them by their baptismal names, in the manner of stating a debt due to a partnership.

To this declaration, it is objected, in the first place, that, admitting the plaintiff has a right to sue, the debt is not set forth according to its legal effect, because it is not stated as directly due to the plaintiff. The words of the statute, § 21, are, " that all suits, actions and proceedings, brought and prosecuted by, or on behalf of such association, may be brought or prosecuted in the name of the president thereof." Under this statute, the proper course of pleading is to show, in the first place, that a debt is due to the association; and then, that the nominal plaintiff was president at the time of declaring. That is done in this instance, and in apt words, provided the names of the real creditors are sufficiently designated by the general name, " The Bank of Central New-York."

The second point taken is, that associations under the act are mere partnerships of individuals, and cannot delegate the right of suing to the president in *his* own name, but must sue in *their* own baptismal names, unless they are a corporation. This is true at the common law. The parties holding the legal interest must sue in their own names; and they must all sue as natural persons, and all be named as plaintiffs. But it does not follow that the president or other person may not be enabled, by a special act of the legislature, to bring an action in his name as president, for

a debt due to a partnership. The power of the legislature to give a right of action to one man in his own name, for a debt due to another, has always been exercised from the earliest period of our legal history; and it is now too late to draw it in question. We have an instance in debts due upon promissory notes, which are made transferable by statute from the original creditor, so as to authorize actions in the name of the transferee. So of the assignees of insolvents; and what is still more pertinent, in the statute 5 *Geo.* IV. *ch.* 73, and several other acts down to 7 *Geo.* IV. *ch.* 67, we have statutes giving similar powers to certain officers or agents of banking partnerships, in England, Ireland and Scotland. The 5 *Geo.* IV. *ch.* 73, § 5, enacts, "That all actions and suits, to be commenced or instituted by or in behalf of any such society or copartnership, against any person or persons, &c. for recovering any debts, or enforcing any claims or demands due to such society or copartnership, &c. shall and lawfully may, from and after the passing of this act, be commenced or instituted and prosecuted in the name of such public officer, for the time being, of such society or copartnership," &c. The officer appointed by the English statutes to sue, is, in general, the secretary of the society or copartnership. The reason and history of their provisions, together with pertinent abstracts from the statutes themselves, will be found in *Van Sandan v. Moore,* 1 *Russ. R.* 458 to 462; *and note (a) to p.* 460. The history is there given, and the course of legislation approved by Lord Eldon; and the abstract is furnished by the reporter. The usual form and tenor of an act enabling such society or copartnership to sue and be sued in the name of its officer, is given in *Colly. on Part.* 654, 5, *Am. ed. of* 1834. Thus we have a direct legislative and judicial authority for the power in question, even admitting the "Bank of Central New-York," to be a partnership.

If it be a partnership, however, perhaps the declaration is defective on demurrer, in not correctly, or rather not fully describing the persons to whom the debt is due. It is not due to an artificial person, which can be described by a collective name, unless "The Bank of Central New-York"

be a corporation.   In declaring on, or in any way describing a contract in pleading, you must always set it forth according to its legal operation and effect; or, at least, it must not be set forth contrary to its legal operation and effect.   *Lawes on Pl.* 62, *ed. of* 1808, *Portsmouth, N. H. Steph. on Pl.* 289, *ch.* 2, § 5, *Rule* 6, *Ed. of* 1824, *Philad. Gould's Pl.* 156, 1*st ed. ch.* 3, § 174, *et seq.*   A debt due to a copartnership may be expressed in the contract as a debt owing to the firm ; but, in legal effect, it is due to all the members of the firm, and is uniformly so stated in pleading. If the action be in their own right, and in the ordinary form, it is well known that they must all be made parties in fact, and all their names set forth as plaintiffs in declaring. The omission of any names, or a variance in stating them, will be a ground of nonsuit at the trial, *Colly. on Partn.* 397, 399, *Am. ed. of* 1834 ; and by parity of reason, where the defect appears on the face of the declaration, it furnishes a ground of demurrer.   The farthest that any court has gone towards sustaining an action in the name of a firm, was probably in *Pate* v. *Bacon & Co.* 6 *Munf.* 219.   The case was on error, after issue and trial ; from which it came before the court of appeals of Virginia.   The ground of decision is not stated ; but the action was allowed in the mere collective name, and I presume the court felt authorized to intend, after verdict, that *Bacon & Co.* was the name either of a natural person or a corporation.   In the case at bar, there is no room for such intendment.   Where the action is, as here, properly in the name of one person entitled to sue in respect to a claim due to others, greater generality may be tolerated in stating the names of the claimants, if the objection be not raised till after verdict; though I believe the indulgence has never been allowed on demurrer.   In *Wright* v. *Welbie*, 1 *Chit. R.* 49, the nominal plaintiffs sued on a policy of insurance upon a ship. The declaration averred the interest to be in " A. and B. (named,) and certain persons trading under the firm of Messrs. William and John Bell & Co. ;" and that the policy was effected for the use of the said " A. and B. and said Messrs. William and John Bell & Co."   After verdict, and

on motion in arrest because the parties in interest were not all named at length, none of the judges denied that the objection would have been fatal on special demurrer, though they refused to arrest the judgment. The real foundation of their refusal to interfere, is probably stated by Holroyd, J., p. 54, viz: that the interest of the owners, and therefore the title of the plaintiff to sue, though defectively set forth, must yet be presumed to have been fully proved at the trial, with all the requisite particulars. The court therefore refused the motion in arrest. The general ground of this refusal is stated and illustrated in 1 *Wms. Saund.* 228, *a, note* (1). Such a defect, says the learned annotator, is not *any jeofail* after verdict. In the case at bar, however, the defendant raises the objection by demurrer. A general demurrer is perhaps sufficient, though of this there is certainly some doubt; and it is questionable whether the defect is reached by any one among the assignments of special causes. If the objection be properly raised, I am strongly inclined to think that the plaintiff must fail, unless we are entitled to treat the bank as a corporation. In the latter view alone could it, in strictness, be presented on the record by a collective name. If it be not a corporation, then the declaration, in legal effect, expresses on its face that the debt is due to a joint stock company, which we cannot avoid seeing must consist of natural persons who are not named. Such a company is always a copartnership, or at least joint tenants, unless it be incorporated. *Colly. on Partn.* 626, 640, *Am. ed. of* 1834. It is so treated by the English statutes to which I referred as authorizing suits in the name of the secretary, I am aware it may be said that the great object of the statute was to avoid the common law difficulty of finding out and detailing all the names of which the firm may be composed; and Mr. Chitty, in his recent publication (A. D. 1836) of new precedents, expressly recommends a form under the general banking law of England, (7 *Geo.* IV. *ch.* 46,) which lays the debt or promise to "the said company" generally. *Vid.* 1 *Chit. Prec. p.* 12, *Form No.* 13, *Am. ed. of* 1839. He refers to no statute nor adjudged case as giving a direct sanction to such a form of

Thomas v. Dakin.

declaring, nor am I informed of any ; and the doubt aris-
ing on the validity of the objection, and the form in which
it is raised, has led me more seriously to inquire whether, in
any view, it may not be entirely obviated by considering
the bank for which the plaintiff sues, as a corporation. If
it be so, then the debts declared on as due from the defend-
ant must be taken, in legal effect, as belonging to an artifi-
cial person, by the name which that person has taken under
the statute ; and they could not have been declared upon as
due to a copartnership.

The general banking law provides, that any person or
*association* of persons, may legally transfer to the comp-
troller a portion of public debt, or equal portions of public
debt and bonds and mortgages on real estate, § 2, 7 ; and
may then issue a corresponding amount of bank notes to
circulate as money. § 3, 14. Such person or *association*
may make the notes obligatory, and payable on demand at
their place of business, after having executed and signed
them in the manner prescribed by law. § 3. The signa-
ture to notes, &c. and all contracts, is to be by the president
or vice president and cashier, § 21 ; any number may asso-
ciate to establish offices of discount, deposite and circula-
tion, with an aggregate amount of capital not less than
$100,000. In order to render the association legally effi-
cient, they shall make and file with the county clerk a
certificate, specifying " the name assumed to distinguish
such association, and to be used in its dealings," its place of
business, " amount of the capital stock of such association ;"
the names, &c. of the shareholders, and the number of
shares held by each ; the period at which such association
shall commence and terminate. § 16. The association
may carry on the business of banking by discounting, &c.
receiving deposites, buying and selling bullion, foreign coins
and bills of exchange, in the manner specified in their arti-
cles of association, &c.; by loaning money on real and per-
sonal security ; " and by exercising such incidental powers
as shall be necessary to carry on such business." They
may choose one of their number as president of such asso-
ciation, and appoint a cashier and such other officers and

agents as their business may require, and remove them, &c. § 18. They may provide in their articles for an increase of their capital. § 20. The shares of the association shall be deemed personal property, transferable on the books, § 19; and the association may purchase, hold and convey real estate for certain purposes, viz: such as shall be necessary for its immediate accommodation, &c. or mortgaged to it as security, or conveyed to it in satisfaction of debts, or purchased by it under judgments, &c. The conveyances to be made to the president or such other officer as shall be indicated, &c. in the articles, &c. " and which president or officer, or his *successor*," &c. may sell the same, free from any claim of the shareholders, &c. ; and it shall not deal in real estate except for the purposes specified. § 24. The association is bound to keep on hand specie *to not less than* $12\frac{1}{2}$ per cent. of their issues. § 33. Such association shall not be dissolved by the death or insanity of any shareholder.. § 19. But the association shall send to the comptroller, semi-annually, a sworn statement of its amount of stock paid in or secured. " The value of the real estate of the association," the shares of stock held by it, " the amount of debts due to the association, &c. the amount of debts due by such association," &c. for six months preceding the statement, and the average amount of specie possessed by the same during each month, &c. § 26. And if such association shall neglect, &c. or shall violate any of the provisions of the act, " such association may be proceeded against and dissolved by the court of chancery, in the same manner as any *monied corporation* may be proceeded against and dissolved." § 27.

The comptroller is first to engrave and print the bills, and cause them to be countersigned by his appointee, to be numbered, registered, and delivered to the association in amounts proportioned to the securites assigned to him. § 1, 2. 7. He is to inquire into and approve the public debt or bonds and mortgages, § 2, 7, 8, which are to remain in his hands as securities for the prompt payment of the notes of the association ; and on default of the makers, such securities may be sold by him, and the avails appropriated to

the payment. § 4, 11, 12. He may give the association powers to receive dividends and revoke them in his discretion, and may change and transfer stocks, § 5, and re-assign bonds and mortgages. § 9. The plates, &c. are to remain in his custody. § 13.

Suits, actions and proceedings by or against such association, may be brought in the name of the president, or against him ; and shall not abate by his death, resignation or removal from office, but may be continued in the name of his successor ; and all judgments and decrees against the president, are operative only against the joint property of the association, which may be taken and sold by execution. § 21, 22. No shareholder is liable in his individual capacity, unless he is declared to be so by the articles. § 23.

The Bank of Central New-York is avowedly an association of persons formed under this law ; in which there is no proviso, such as we find in the British statutes giving partners a right to sue by their officer, that nothing contained in the act shall be construed to create a corporation, *Colly. on Part.* 655, *Am. ed.* 1834 ; and it was denied by the counsel for the plaintiff, that their constituents are either a partnership or a corporation ; nor did they favor us with any definite class of legal formation, to which the bank can be reduced. In view of a constitutional question, which I think does not arise, but which the counsel seemed to suppose more formidable than any other, their efforts were directed mainly to establish the position, that at any rate associations under the banking law are not corporations. They said there are four distinctive *indicia* which mark an aggregate corporation and separate it from every thing else : 1. A collective existence by name, created by the sovereign power exercised directly or mediately ; 2. A standing in court as a collective existence by a given name or designation, with the rights and liabilities of a party litigant ; 3. Power to take and convey title to property, acquire and give rights as a collective existence, and by its given name or designation ; 4. Power conferred by statute to make by-laws, in other words, to prescribe rules of action for persons without their consent.

Independent of authority and general reasoning, I have had very great difficulty, on a simple reading, to avoid seeing plain, direct and express enactments in the general banking law, conferring all the requisites thus demanded by counsel. 1. I read of a collective existence, i. e. a body of men associated under a name conferred *mediately*, i. e. through the certificate of association, by the sovereign power, which is the legislature. 2. As such collective existence, I read that the association has a standing in court, perhaps in its own name, or at least in the name of its president. It recovers judgments for debts due to it, and execution is levied on its property, upon a recovery against it. 3. I read of power to take and convey title to property, acquire and give rights ; all this to be done, as it must be in every corporation, by its agents, but certainly in its collective name and designation ; for the statute demands that the name which it assumes shall be used in all its dealings. 4. I shall have occasion to show that under a general provision of the act, there can be no doubt of its power to make by-laws. There are various considerations connected with this short view of the question, which may perhaps tend to the illustration, distinctness and strength of that view.

The associations formed under the act may, like our ordinary banks, elect their president, cashier and directors, confer on the latter as I have assumed and intend to show, the power to make and repeal by-laws, to regulate elections, and through their proper agents in the name of the association, to exercise all the other functions of our ordinary incorporated banking institutions. The latter are well known as aggregate moneyed corporations. It cannot be denied that a voluntary association or partnership might, temporarily, also elect the like officers and agents, confer upon them nearly the same powers, and perform about the same functions, without any charter or act of incorporation whatever. *Colly. on Partn.* 621, *Am. ed.* 1834. There is, however, much difference between the power, duration and legal effect : a corporation aggregate is in law an individual entirely distinct from its members, each of whom may hold shares or interests in the corporation, legally transferable in virtue of

its charter; whereas, a voluntary association is made up of individuals not distinct from, but belonging in their own names and rights to the company. Their shares or interests are common to all; and, except so far as these may be made up of property in possession, they cannot be transferred so as to create any thing more than an equitable right in the assignee. Hence a voluntary company, asserting that it is possessed of stock transferrable at the option of the holder, has been said to be punishable for pretending to act as a corporation. *Coll. on Part.* 624. The members of a copartnership are joint tenants in the stock and all the effects of the company; and, on the death of each, his interest in the common choses in action, at law, survives to the other members, while his interest in the common land and choses in possession passes, as an undivided share, to his heirs or personal representatives. *Id.* 4, 5, 68. The nature of these interests and the course of succession are, in some respects, modified by the court of chancery. *Id.* 70, 71. All the members must, as we have in part before seen, be named in suits by or against the company, the right or liability to which, on the death of one, survives to all the others. *Id.* 386, 395, 420, 427. Each is individually liable for the whole debts due from the company, *id.* 212, and may release and discharge all the debts due to them. *Id.* 239. One may enter upon, use or otherwise control all the common property, real or personal; indeed he may, in general, convert it to his own use, subject to an account. *Id.* 211. All the remedies *inter se*, with few exceptions, are by action of account or bill in equity. *Id.* 143. The firm cannot, in general, sue or be sued by any one of its members, for this would involve the absurdity of a man being both plaintiff and defendant on the same record. *Id.* 143, 644, 5. Partnerships are dissoluble, not only by death or insanity, but by the bankruptcy of a member; a general sale of his partnership effects by execution; his attainder of felony, if it result in his civil death; an assignment by himself of all his interest, and the marriage of a partner who is a *feme sole.* Indeed, the better opinion is, that, however strong the provisions against a dissolution may be in the articles of copartner-

ship; the whole concern may be dissolved at any time, by the act of a single partner, at his own mere pleasure.    Even during the continuance of the partnership, he may interrupt its proceedings, by interdicting any single measure, though agreed on by a majority of the firm.    At least this is generally so at law, and the power, it is apprehended, can be but partially qualified by a court of chancery.    *Id*, 58, § 2. 3 *Kent's Comm.* 53, 4, 3d ed.    It would seem clearly to follow, if it has ever been disputed, that any powers, though jointly conferred on others, as to act in the direction of affairs, or use a common seal, may be revoked at the pleasure of either partner.

Most of these incidents, it is impossible for the partners to avoid by any stipulations in their articles of connection; and in proportion as any body of men is authorized by statute to hold property and sue and be sued without such incidents, they approach the character of a corporation.    While they continue partners, they are considered as natural persons merely, as so many joint tenants or tenants in common of all their property.    In proportion as, by statute, they cease to be so, they become an artificial person.    These two are the only persons known to the law, according to the language of the great commentator.    1 *Black. Comm.* 123. " Persons," says he, " are divided by the law into either natural persons or artificial.    Natural persons are such as the God of nature formed us.    Artificial are such as are created and devised by human laws, for the purposes of society and government, which are called corporations or bodies politic." In another part of his work, *id.* 467, he shows the advantages of corporations over partnerships or voluntary companies. He says, " corporations are formed in order to preserve entire and forever, those rights and immunities which, if they were granted only to those individuals of which the body is composed, would, upon their death, be utterly lost and extinct."    In a mere voluntary assembly, he admits the individuals that compose it, might act up to the purposes for which they associated, so long as they could agree to do so ; " but they could neither frame nor receive any laws or rules of their conduct ; none at least which would have any

Thomas v. Dakin.

binding force, for want of coercive power to create a suffi-
cient obligation ; and when they are dispersed by death or
otherwise, how shall they transfer their advantages to others,
equally unconnected with themselves ?  · So, also, with re-
gard to holding estates or other property, if land be grant-
ed for the common purpose to twenty individuals not incor-
porated, there is no legal way of continuing the property
to any other persons for the same purpose, but by endless
conveyances from one to another, as often as the hands are
changed.   But when they are consolidated and united into
a corporation, they and their successors are then consider-
ed as one person in law ; as one person, they have one will,
which is collected from the sense of the majority of the
individuals; this one will may establish rules and orders for
the regulation of the whole, which are a sort of municipal
laws of this little republic; or rules and statutes may be
prescribed to it at its creation, which are then in the place
of natural laws : the privileges and immunities, the estates
and possessions of the corporation, when once vested· in
them, will be forever vested, without any new conveyance
or new successions ; for all the individual members that have
existed from the foundation to the present time, or that
shall ever hereafter exist, are but one person in law, a per-
son that never dies: in like manner as the river Thames is
still the same river, though the parts which compose it are
changing every instant.''   In this quotation, I have taken
the words of Blackstone as he applied them, by way of exam-
ple, to the case of a college in one of the English universi-
ties; and without quoting him literally throughout, have con-
fined myself to such things as the learned author considers
peculiar to every aggregate corporation.   These are, in
short, the receiving of peculiar laws, and the making of by-
laws for itself; perpetual succession, both as to its privileges
and property; the having one will, as collected from the
power of the majority to make by-laws ; and the being but
one person in law, a person that dies not, but continues the
same individual, though its parts may change.   *See also
Ang. & Ames on Corp.* 23.

   Let us see how far these characteristics of a corporation

are collectable from the general banking law. It is quite obvious that the associations formed under that statute receive certain laws which are not applicable, without legislative aid, to any voluntary association of natural persons. Such is the law of exemption from individual liability for the debts of the company; of exemption from a dissolution by the death or insanity of any member; the law conferring the complete legal right on each member to transfer his share in the stock of the company; and the right to compel the comptroller and his successors to act as trustees in the affairs of the association, so long as it shall exist, which may be a thousand years, if its articles fix a limitation so long. Such is the law which confers the right to elect a president, and of pleading and being impleaded through him and his successors. He and his successors are also compellable to hold the real property of the company in trust, or as an agent, and to transfer it from time to time. Such too is the law which confers the power to make by-laws, and have a common seal, which I shall presently notice as being the result of, though not expressly conferred by, the statute in question. By giving the association power to fix in its articles the time of its duration, the statute cuts off the power of dissolution at the pleasure of an individual, or from any other causes than such as it enumerates.

No part of the statute declares, in terms, that in respect to the personal property of the association, such as its specie in the vaults, money on deposite, bullion purchased and debts due, it shall hold otherwise than as a partnership; and so with regard to its beneficial interest in the stocks, bonds and mortgages assigned to the comptroller, or its land, a conveyance of which it is to take in the name of the president. It is, however, the real owner of the whole. The statute declares that it shall take a name; and that the association thus named shall, after prescribing its own duration, assign the securities to the comptroller; that it may hold specie, receive deposites, make loans, and hold real estate. It is impossible for a single member, as a partner may, to transfer an absolute right in any of the common effects to a third person, at least none which are tangible to any execu-

Thomas v. Dakin.

.tion which may be issued against the president. Besides, the latter or the vice president, with the cashier, are to sign all contracts, including, it is presumed, all contracts of sale and assignment as well as others—as in other banking institutions, he and the cashier may be placed under the control of the board of directors. It is difficult to conceive of any other form in which a contract can be made. The power is permanent, and may pass in succession from the president, &c. to his successors, controlled by the directors and their successors, perhaps through thousands of years. The association must, in the nature of things, be continued by a succession of members during the term for which it has elected to enjoy the privileges conferred, and to assume the duties imposed by the statute. It must take a name, says the statute, " to be used in its dealings." It must continue to hold that name. By this it must be known and identified ; and a simple legislative declaration that it might own or hold property or rights of any kind, would therefore seem to imply that the title should be commensurate with its existence. The statute, in various places, not only presupposes, but expressly declares, that the association shall have absolute rights of property. It deals in the name taken : that is, it contracts, acquires property, and transfers it in a course of dealing as an individual. This is true, at least of the beneficial interest in its real estate, and is literally true of its bonds and mortgages. In both these latter, it continues to hold title as a *cestui que trust*. Nay more : I do not see why, in respect to its real estate, it may not be deemed legally seized or entitled in fee, or of a less estate. The conveyance must, it is true, be taken in the name of the president, or some other person. But the latter is a mere agent or conduit : the association pay the price, which should, in order to be true and give a proper character to the purchase, be mentioned in the deed of conveyance. Then how is he to convey, except as an agent in the name of his principal, the association ? And if he be called on to grant, for example to convey a fee or less interest in a rent, how is that to be done without the ordinary form of affixing the common seal of his principal ?

The question is, can the various attributes conferred by the statute exist in any other than a body politic and corporate? Such a body, whatever it may be called in common parlance or otherwise, can be known in legal classification by its attributes alone. It is agreed by all the books, that no particular words are necessary to create a corporation. An express declaration that a certain association shall be a corporation, is not necessary: equivalent words are sufficient. 2 *Jac. Law Dict.* 94, *Corp. 1.* 2 *Kent's Comm.* 276, 3*d ed. Ang. & Ames on Corp.* 17, 45. Accordingly, the king's charter granting property to a body of men by name, or conferring certain privileges on them, has been holden to make them a corporation. A grant of land by the king, to the inhabitants of B., their heirs and successors, rendering rent, is one instance. 2 *Jac. Law Dict.* 94, *Corp. I.* A like case occurred in our own courts, where the words received a similar construction. *Denton* v. *Jackson*, 2 *Johns. Ch. R.* 320, 324. But words still short of these have been held sufficient. A grant of land by the king to the good men of the town of Islington, rendering rent, without saying to hold to them, their heirs and successors, of itself creates a good corporation perpetual. 1 *Kyd on Corp.* 4. *Dy,* 100, *pl.* 70. Kyd remarks, at the page quoted from his work, that when the king demised to townsmen at a certain rent, it was necessarily *implied* that they were capable of enjoying property in their collective or corporate capacity, *And see per Savage, Ch. J., in North Hempstead* v. *Hempstead*, 2 *Wendell*, 133, 4. So in respect to the grant of a privilege. If the king grant to the good men of Islington to be discharged of toll, they shall be deemed incorporated for the purpose of claiming and enforcing the privilege, 2 *Jac. Law Dict.* 94, *Corp.* 1. 1 *Kyd on Corp.* 9. So of a grant to a body of men to hold mercantile meetings. 2 *Kent's Comm.* 276, 3*d ed.* 2 *Johns. Ch. R.* 325 ; an instance commented upon in the case of Sutton's Hospital, 10 *Co. R.* 23, 28, 30, &c. The principle of these and the like cases is, that words of the king granting that a body of men shall have the power to hold property or enjoy privileges, amount by the force of the phrase, by operation or implication of law,

to the creation of a corporation : in other words, it is a virtual declaration that the grantees shall hold and transmit, not by succession to their heirs or distributees as natural persons, thus dividing and confounding the inheritance, but as a corporation aggregate, a single individual, in order that the estate may be kept entire. I need scarcely observe, that the words of an act of parliament, or of our state legislature, have at least equal force with a royal grant. That this has been so understood judicially, see several instances in *Denton* v. *Jackson, 2 Johns. Ch. R.* 325.

Among other peculiar privileges conferred on these associations and not enjoyed by natural persons, I allude to that of the exemption of its members from personal liability for debt. This is mentioned by Angell and Ames in their Treatise, as peculiar to a private aggregate corporation, *Angell & Ames on Corp.* 349, *and the cases there cited at p.* 23 ; they notice it as a striking distinction between a corporation and a partnership.

Let us now inquire whether the power of making by-laws is conferred. That, with several other powers of a corporate character, if they exist at all, must be referred to the general clause in the statute, giving the associations a right to exercise *such incidental powers as shall be necessary to carry on their business.* One of these necessary powers is obviously to make by-laws. Who ever heard or supposed that a board of directors with power to enact by-laws, is not necessary in every aggregate banking institution ? That such a power is necessarily incidental to the carrying on its business, is sufficiently evinced by the fact that no such institution has ever found itself able to proceed without it. I do not deny that partners may, by agreement, confer that power even on the majority of a board of directors; but the power would be, like any other, revocable at the will of the constituent. In an aggregate corporation it is permanent, and this is doubtless the reason why Blackstone and others mention it as a distinctive characteristic. 1 *Kyd on Corp.* 69. *Ang. & Ames on Corp.* 58. No reason was mentioned in argument, nor can I conceive any, which exempts associations created under the general banking law, from a neces-

sity which has heretofore, in all similar cases, been deemed imperious; and so far as articles of association under the act have come under our notice, they have expressly conferred the power of making by-laws on a majority of the board of directors.    Art. 4, § 2, of the North American Trust Company, for instance, an association established in the city of New-York, after a previous declaration that its charter should terminate on the 1st November, A. D. 2301, and providing for a permanent board of forty directors, enacts as follows : "The board of directors shall have authority to determine, &c. and to make such by-laws, rules and regulations, *for the management of the business of the association*, and the government of themselves, officers and agents, as they may think expedient, not inconsistent with law or these articles of association ; and such by-laws, rules and regulations to alter at pleasure."    The board immediately after, enacted fifteen pages of by-laws, every one of which would seem necessary to a prudent conduct of their business.    Among these they regulated the transfer of stock, and provided for fixing the compensation of officers by the directors.    There can be no doubt that any other necessary corporate power, such as devising and using a common seal, is equally within the general clause of the statute, if the use of such a seal should become necessary in the transaction of business ; and it has been said clearly to be so, where the corporation undertakes to grant an incorporeal hereditament.    *Per Bayley, J. in Harper* v. *Charlesworth, 4 Barn. & Cress.* 575. 6 *Dowl. & Ryl.* 589.    Indeed, it was said on the argument, and not denied as I recollect, that some associations under the act had already devised and adopted a common seal. Though a partnership might also devise and agree on the power to affix a seal, yet this, like a partnership power to make by-laws, would be revocable at the pleasure of each. A common seal is not, however, essential to the more important business of a moneyed corporation ; and the power to make or use one might doubtless be interdicted without at all detracting from the essential characteristics of a corporation.    The right of an aggregate corporation to contract in general without seal, is perfectly well settled by modern

authority. *Ang. & Ames on Corp.* 109, 110. *Steele* v. *The Owego Cotton Manufacturing Co.* 15 *Wendell,* 265, 6.

The power to make by-laws was very properly treated by the learned counsel for the plaintiff, as the most distinct characteristic of a body politic; and they labored, though I think clearly without effect, to show that associations under the general banking law do not possess the power. Yet at the same time they admitted, that no corporation in the state could fulfil the object of its creation without such power. That admission alone, if correct, we have seen brings the power, as a *necessary one,* within the general clause of the statute. The act of the legislature is, in itself, but the outline, the covering to the machinery within. The moment we are over the threshold, we see a board of directors, a legislature made permanent and indissoluble for hundreds or thousands of years. In the language of Blackstone before cited, " as *one person* they have *one will,* which is collected from the sense of the majority of the individuals; this *one will* may establish rules and orders for the *regulation of the whole,* which are a sort of *municipal laws* of their *little republic."* The third article of the North American Trust Company, § 1, is framed in that spirit. It is in these words : " All the power, rights and privileges of *each and all the associates,* and *those who may become such by virtue of these articles,* are hereby *irrevocably delegated to* and *vested in,* and shall be exercised *only by a board of directors,* and such officers and agents as they shall appoint." The subsequent articles provide for the perpetual election and succession of the members of the board. Here resides that *one will,* mentioned by Blackstone, which regulates the whole, which acts as that of *one person* and under *one name.* Here we see more distinctly the corporation described by *Grotius,* whose definition we shall by and by cite in another connection, *united in name* with one constitution, or one spirit, (*spiritum unum.*) Here is a majority acting and binding the whole, irrespective of consent from the constituent, except by his representative ; in short the same power is exercised in the same form and with the same effect, as by an ordinary safety fund bank direction. The directors make

the laws and alter and repeal them at their pleasure; they elect the president, vice president and cashier. These and all other powers are *irrevocably delegated* to them through a tract of future time, longer perhaps than the most sanguine republican would assign for the duration of his national institutions. If the powers of a body politic and corporate can yet be denied of an institution such as we have been contemplating, the definitions of learned writers would seem from the earliest day, to be a mere series of mistakes. That, however, will not be pretended; and it may be useful in the present connection to notice a few which are most familiar to the students of our law.

After a corporation is formed and named, says Blackstone, 1 *Black. Comm.* 475, " it acquires many powers, rights, capacities and incapacities. Some of these are necessarily and inseparably incident to every corporation; which incidents, as soon as a corporation is duly erected, are tacitly annexed of course, as 1. To have perpetual succession. This is the very end of its incorporation; for there cannot be a succession forever, without an incorporation, &c. 2. To sue or be sued, implead or be impleaded, grant or receive by its corporate name, and do all other acts as a natural person may. 3. To purchase lands and hold them for the benefit of themselves and their successors, &c. 4. To have a common seal, &c. 5. To make by-laws, &c. The same powers are mentioned in 2 *Kent's Comm.* 277, 3*d ed.*

As to the first requisite of perpetual succession, Kyd observes, when it is said that a corporation is immortal, we are to understand nothing more than that it is capable of an indefinite duration, 1 *Kyd on Corp.* 17 ; and, indeed, it is well known that our common banks are none the less regarded as corporations, because their charters are limited to a term of years. It is enough that they enjoy the right of succession for that term. As to the second requisite of a corporation using its own name in suits, and in grants, &c. this is not essential; clearly it may be an act of the legislature, and the books say even by prescription, to a certain extent, sue or defend in one name and deal in another ; and,

Thomas v. Dakin.

by parity, it may deal in real estate by one name, and personal estate in another. *Angel & Ames on Corp.* 56, *and the books there cited.* It was not, therefore, much insisted on the argument, that, because the legislature had provided for litigating all the disputes of these associations in the name of the president, &c. or that the association should take or convey real estate in his name, they necessarily came short of a corporation. Should a statute provide that all our incorporated banks should litigate, or deal in real estate, in the name of the president, it would hardly be contended that they were the less corporations for that reason. The remark by Blackstone, in respect to the other acts which they must have power to perform as a natural person may, has relation, of course, to such powers only as they may exercise within the limits of the corporate authority granted. 1 *Kyd on Corp.* 70. *Angel & Ames on Corp.* 2. Several of the other requisites mentioned by Blackstone, are doubtless not essential, though they may be ordinarily incident to a corporation. The dealings of a moneyed corporation may, as we have seen, be mostly conducted without the use of a common seal, and they might be totally restrained from dealing in lands without ceasing for that reason, to be a corporation. Accordingly, Mr. Kyd says : "It is material to observe that, though many things be *incident* to a corporation, yet to form the complete idea of a corporation aggregate, it is sufficient to suppose it vested with the three following capacities : 1. To have perpetual succession under a *special* denomination and under an artificial form ; 2. To take and grant property, to contract obligations, and to sue and be sued by its corporate name, in the same manner as an individual ; 3. To receive grants of privileges and immunities, and to enjoy them in *common.* These alone are sufficient to the *essence* of a corporation." 1 *Kyd on Corp.* 13, 69, 70 ; adopted in terms, 2 *Kent's Comm.* 277, 278, 3d ed. How far these three essentials may still be qualified, we have before seen. It does not enter into essentials, that the association should be able to litigate in its corporate name. If an association then, be created with power in itself and successors, under *any name*

or *several names*, to take and grant property, to contract obligations, to enjoy privileges and immunities *in common*, with the incidental power of impleading and being impleaded by any name, we seem to have a complete corporation aggregate, although many things mentioned as usually incident to it be omitted. *See* 1 *Kyd on Corp.* 13. In Sutton's Hospital, 10 *Coke*, 28, the essential requisites are also enumerated; and they will be found not to exceed the measure already supposed.

The great and essential object to be attained by the creation of a corporation, is *continuity* [sometimes called *immortality*] and *individuality*; " properties," says Ch. J. Marshall, " by which a perpetual *succession* of many persons are considered as the same, and may act *as the single individual.* They enable a corporation to manage its own affairs, and to hold property without the perplexing intricacies, the hazardous and endless necessity of perpetual conveyances for the purpose of transmitting it from hand to hand." *Dartmouth College* v. *Woodward*, 4 *Wheat.* 636. *Angel & Ames on Corp.* 2. A peculiar sort of *individuality*, and a peculiar mode of *succession*, for a particular purpose, and not allowed by the general law to natural persons, enter into every definition of a corporation that I have seen. 1 *Kyd on Corp.* 2, 3. With us, there can be no recent creation of such an artificial person except by statute. 2 *Kent's Comm.* 276, 3*d* ed. No agreement of individuals can so far alter the nature of things; and, as we have seen of *persons*, there can be only two kinds, natural and artificial, so there can be but two modes in which property is transmitted by succession. The one takes place between natural persons, of which we have an example in descent on the death of the ancestor; the other is between predecessors and successors in a corporation aggregate or sole. The one may be called a natural, and the other an artificial succession; and it is evident that the latter cannot exist independent of a corporation, any more than the former without natural persons. 1 *Kyd on Corp.* 2. 3.

In the associations created by the banking law, great care has been taken to introduce and maintain corporate

succession in every part of the system. I have already endeavored to show, that the beneficial interest in all its real and personal property belongs to any association formed under that law, as an individual. If I have succeeded, it follows that such association is a corporation. The principle of succession is equally maintained in respect to the president, for the purpose of receiving conveyances of real estate and selling it; and so when he acts as the organ of maintaining actions in right of the association, and defending actions brought. All these rights, powers and duties, pass in perpetual succession from president to president during the existence of the company. The president and his successors thus come to enjoy, in the nature of a sole corporation, a perpetual trusteeship in the real estate, and a perpetual power or control over it, together with the suits of the company. " From their *having perpetual succession,* and *suing and being sued* in their political character, single persons of both these descriptions have" (without much propriety, as Mr. Kyd thinks,) " been uniformly, in the books of English law, called corporations." *Kyd on Corp.* 19, 20. " A sole corporation, as its name implies, consists only of one person, to whom and his successors belongs that legal perpetuity, the enjoyment of which is denied to all natural persons." *Angel & Ames on Corp.* 18, 19. 1 *Black. Comm.* 469. It need scarcely be remarked that the president of one of the banking associations in question, comes fully within the general definition. In England, sole corporations are mostly employed to hold in succession the rights and property of the ecclesiastical establishment; and it is said they cannot take personal property in succession, but only real. Sole corporations are not common in the United States. *Angel & Ames on Corp.* 19, 20. But it is not perceived why an officer, or other person authorized to hold property, *real or personal,* to him and *his successors,* be not a sole corporation within the plain meaning of the definition. The chamberlain of London, who may take a recognizance to him and *his successors,* in his politic capacity, in trust for orphans, was said to be a sole corporation in trust. *Byrd* v. *Wilford, Cro. Eliz.* 464. It was there said

by Gawdy and Fenner, Js. that the chamberlain was a spe-
cial corporation for that purpose ; and an *obligation* may as
well go in succession as *land.* So of the comptroller who
takes an assignment of stocks, bonds and mortgages, to hold
under the general banking law. Surely these would not,
on his death, go to his executors. They are holden by him
in trust, to pay the debts of the association ; and would pass
to his successors. He is equally a corporation sole, for this
special purpose, according to the English definition. The
supervisor of a town may sue or be sued. 2 *R. S.* 387, 8,
§ 96 and 100, 2*d ed.* `Suppose he were authorized to hold
lands and chattels to him and his successors, in trust for his
town, would he not be a sole corporation, as the board of
supervisors or loan officers are an aggregate corporation in
respect to lands which they hold for the county ? *Denton
v. Jackson,* 2 *Johns. Ch. R.* 325. The grand test of a cor-
poration is the mode in which property succeeds from one
to another. When it does not go to the heirs of the holder
as a natural person, it passes to the successor or successors,
because it is holden in a corporate capacity. The holders
are therefore said to be a person or body politic and cor-
porate, in opposition to their natural capacity. Thus, all
property must be holden by natural persons or corporations.
If the property of an association under the general banking
law be not holden in the natural capacity of the different
members as partners, the only alternative remaining is a
holding by corporations aggregate or sole. No third de-
scription of person is known to our law. None was known
to the Roman law. *See* 1 *Browne's Civil and Adm. Law,*
141. None to any system of laws with which we are ac-
quainted. There are two cases in 1 *Roll's Abr.* 515, which
shew still more distinctly that the president of an associa-
tion, and the state comptroller, must be considered each as
sole corporations. One is where a president of a college of
physicians recovers, in that character, a penalty against a
party for practising without license. Another is where the
master of an hospital recovers, in that character, the arrears
of the annuity due to the hospital. On the death of either,
the interest in the judgment recovered passes to his succes-

sor, and not to his executor ; and simply because the debt thus goes in succession, and *Toller* says they are each a special or sole corporation like the chamberlain of London before mentioned. · *Toll. on Ex. ch.* 4, § 3, *p.* 136, *ed. of* 1803. *See also* 1 *Wms. Ex.* 546, *ed. of* 1832. · *Atkins* v. *Gardener, Cro. Jac.* 159. This matter is very fully illustrated in 2 *Black. Comm.* 431, 2.

It has been impossible for me to see the force of the argument that, because the legislature have constantly avoided to call · these associations, or any of their machinery, *a corporation*, therefore we cannot adjudge them to be so. If they have the attributes of corporations, if they are so in the nature of things, we can no more refuse to regard them as such, than we could refuse to acknowledge John or George to be · natural persons, because the legislature may, in making provisions for their benefit, have been pleased to designate them as belonging to some other species. Should the legislature expressly declare each of them to be corporations, without giving them corporate succession, or other artificial attributes, the declaration would not make them so. On the other hand, even an express legislative declaration that certain associations are not included in the definition of corporations, would not change their character, provided they should in fact be clothed with all the essential powers of corporations. Suppose the legislature should attempt to create an ordinary safety fund bank, with its usual machinery, by a majority vote ; could the bank thus created maintain its ground, merely because the statute might, in conclusion, declare that such bank should not be called or known as a corporation ? The restrictive provision in the constitution was levelled at the *thing*, not the *name;* at that species of legal being, already known to the law as a corporation, not what the legislature might call so.

I before remarked that, in the statute before us, the legislature no where disavow the intent to create corporations. On the contrary, they went on conferring attribute after attribute, till at length they seem themselves to have viewed the associations, for the formation of which they had been providing, as moneyed corporations. Accordingly they ex-

pressly declare, by § 27, that if any association to be form-
ed under the act, should omit to fulfil the various duties re-
quired, " It shall be proceeded against and dissolved by the
court of chancery, in the same manner as *any moneyed cor-
poration* may be proceeded against and dissolved." By re-
curring to the proceedings prescribed in such case, it will
be seen that they can scarcely be made applicable to any
body of men other than a moneyed corporation. The or-
dinary jurisdiction of chancery, though of familiar applica-
tion in the dissolution and winding up the concerns of a
partnership, was very properly treated as unequal to the pur-
pose of dissolving one of these associations.

There was nothing incompatible with this view in the
constant previous use of the word *association.* This is said
to signify " *confederacy,* or *union* for particular purposes,
good or ill." *Johns. Dict. 4to. Association,* 2. In that
sense it is a generic term, and may indifferently compre-
hend a voluntary confederacy, which is a partnership dis-
soluble by the persons who formed it, or a corporate con-
federacy, deriving its existence from a statute, and dissolu-
ble only by the law. For the first, there is no need of a
statute or charter. Natural persons, as they were created
and exist, were enabled to form it, but they are tied down
and must continue natural persons, until the legislature
coming to their aid, disenthrals them, and with their own
consent, transforms them collectively into a single person
of another species. This has been likened, by Sir John
Davies, to the creative power of Deity. He says:

> " Of this we find some foot-steps in our law,
> Which doth her root from God and nature take;
> Ten thousand men she doth together draw,
> And of them all *one corporation* make."

*Grotius* calls a corporation *consociatio,* which signifies *as-
sociation.* He applies the term to a people, which is prop-
erly considered a corporation in respect to its power of in-
dividual action and ownership. The late Chief Justice
Savage, in *North-Hempstead* v. *Hempstead,* 2 *Wendell,*
135, says: " The state of New-York owns a large quantity
of land, which belongs to the people of the state, not in
their *individual,* but in their political capacity. The people,

therefore, are not tenants in common in those lands ; and an entry upon the lands, without the license of the *corpora- tion,* (the *state,*) would be a trespass. The same relation exists in all *corporate* property, whether it belongs to a *county,* a *town,* a *city,* a *college,* an *academy,* a *church,* or a *bank.*" *Grotius,* speaking of the state, substantially fur- nishes Blackstone's definition of a corporation. I quote from *Book* II. *ch.* 9, § 3. " *Isocrates,* and after him the Emperor *Julian,* said that states were *immortal :* that is, they *might possibly prove so ;* because the people is one of those kind of bodies, *(populus est ex eo corporum genere,)* that consist indeed of separate and distinct members, but are, however, united *in name (unique nomini subjectum est,)* as having one constitution only, according to *Plutarch ;* one spirit, *(spiritum unum,)* as *Paulus* speaks. Now this spirit or constitution in the people, is a full and complete *associa- tion* for political life, *(est vitæ civilis consociatio plena atque perfecta.)* And the first and immediate effect of it is the sovereign power, the bond that holds the state together, the breath of life which so many thousands breathe, as *Seneca* expresses it. For these *artificial bodies* are like the *natu- ral.* The natural body continues to be still the same, though its particles are perpetually upon an insensible flux and change, whilst the same form remains, as *Alphenus,* from the philosophers, argues." In the second subdivision of the same section, he adopts the like comparison with Black- stone, between a corporation and the Thames. *Grotius* there quotes *Heraclitus,* who said, " We cannot go down twice into the same river; which *Seneca* very judiciously explains, viz. the *name* of the river continues, though the *water* is continually gliding along. So Aristotle, comparing a river to the people, said, the river retains the same *name,* though some *water* is always coming and some going." Much of this which I have quoted from *Grotius,* is referred to in the notes to 1 *Kyd. on Corp.* 18. It is there given in the original Latin. The word *Consociatio* is translated, in- differently, *consociation* or *association. Ainsworth's Dict. quarto,* translates it *partnership, consociation,* &c. In the *Jesuit's Dict. of* 1616, it is rendered *association,* both in

English and French. In an approved translation of *Grotius,* A. D. 1738, it is rendered *association ;* and by the same word in a French translation of the same book, A. D. 1724. The reference in Kyd is to the third book of *Grotius :* it should have been to the second. On the whole, it turns out that the word *association* used in the general banking law, so far from being incompatible with the common law idea of a corporation, is perfectly consistent with it, and has been used by standard writers as signifying the same thing.

It was said on the argument, that should one of the associations created by the banking law refuse to elect a president, it could have no standing in court; that it would want one of its integral parts. If that were so, it is no more than what may happen to an acknowledged corporation. If that cease to perform its appropriate functions, or, in other words, is guilty of non-user, it may be proceeded against and ousted by quo warranto. 2 *R. S.* 483, § 39, *sub.* 3, 2*d ed.* 2 *Kyd on Corp.* 448, 9, *et seq. Angel & Ames on Corp.* 77. The better opinion is, however, that so long as members capable of choosing officers exist, the omission will not *ipso facto* work a dissolution, but a mere suspension at most. *Angel & Ames on Corp.* 77. Nor is it by any means certain, that a corporation created under the general banking law, may not sue or be sued by its corporate name. The statute merely gives an option to sue the president, or bring actions in his name. § 21, 22. The right to sue or be sued in the corporate name, is not expressly prohibited ; and such capacity being an implied incident of every corporation, there is a doubt whether it can be taken away without an express prohibition. There would be more question in respect to the power of *contracting* independent of the president, inasmuch as the statute has declared, § 21, that contracts shall be signed by him. But a presiding officer is not, in the nature of things, essential to all kinds of corporate action. It was said, in the case of *Sutton's Hospital,* 10 *Co. Rep.* 28, 9, that an aggregate corporation might be complete, though it had only a body without a head ; and several instances are there given. Again : suppose, that on the failure to elect a president, the

members of the association must all implead and be impleaded as partners; the being put to such a remedy is not decisive against the association being considered as a corporation in other respects. Statutes of express incorporation are sometimes so framed as to give the creditor a choice to sue the association either as a corporation or as a partnership. *Allen v. Sewall*, 2 *Wendell*, 327, 338. In short, the forms or modes in which the corporation is to perform its several functions, is not the test. " For," as *Grotius* says, " we must know that there may be several forms of one and the same artificial thing, as a legion has one form of command, and another of engagement." *Book* 2, *ch.* 9, § 8, *sub.* 2.

In endeavoring to identify this artificial thing, or, more properly, *person*, I have, so far, confined the survey mainly to the books of the common law, and other books which have given us features and lineaments as known from the most ancient days to the passing of the revised statutes. The latter, it will be found, have not varied the description. 1 *R. S.* 602, 2*d ed.* They declare as follows: § I. " Every corporation, as such, has power: 1. To have succession by its corporate name, for the period limited in its charter; and when no period is limited, perpetually: 2. To sue and be sued, complain and defend, in any court of law or equity: 3. To make and use a common seal, and alter the same at pleasure: 4. To hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter: 5. To appoint such subordinate officers and agents as the business of the corporation shall require, and to allow them a suitable compensation: 6. To make by-laws not inconsistent with any existing law, for the management of its property, the regulation of its affairs, and for the transfer of its stock. § II. The powers enumerated in the preceding section, shall vest in every corporation that shall hereafter be created, although they may not be specified in its charter, or in the act under which it shall be incorporated."

Regarding then " The Bank of Central New York" as a corporation, the pleader brings assumpsit against the defendant, and declares in the name of " Anson Thomas, who

is president of the Bank of Central New York," an association of persons formed for the purpose of banking under the provisions of the act, &c. entitled, &c. who prosecutes on behalf of said association, pursuant to the provisions of said act, &c. For that whereas the said defendent, heretofore, &c. on, &c. at, &c. was indebted unto the said " Bank of Central New-York," for so much money, &c. and at the conclusion gives copies of three bills of exchange drawn by the defendant, payable to his own order, and endorsed by himself in blank. My conclusion upon this form is adverse to the objection made by the defendant's counsel, that no cause of action appears in Anson Thomas, unless the defendant's further objection be well founded, which is, that the act to authorize the business of banking, by providing for an indefinite number of corporations at the pleasure of individuals, is unconstitutional and void on its face. If void, the association is *still but a partnership ;* and the declaration remains open to the objection that the names of the natural persons composing the firm are not stated.

The words of the constitution are, that " the assent of two-thirds of the members elected to each branch of the legislature, shall be requisite to every bill creating any body politic or corporate." The restriction intended to be imposed, I am of opinion, relates entirely to the number of members whose assent is required, and not to any particular form in which the corporation is to be created, nor to the number of corporations provided for by the bill. It is perfectly well known that the legislature have always exercised the right of passing general statutes authorizing associations of individuals to incorporate themselves on complying with certain provisions. These incorporations have generally been for religious, literary or manufacturing purposes ; and instances are too familiar with every one to require a quotation of examples. It is obvious that the same power must always have been understood to exist with reference to any other objects. It was as well understood when the new constitution was adopted, as at any time since ; and had the restraint now contended for been desirable by the framers, nothing was easier than to say so. We must understand

the constitution as recognizing the known modes of legisla-
tion, when nothing is said in it to the contrary. The assent
required to the bill is, in its own nature, immediate, and is
given in the form of an immediate assent. But the bill
need not and cannot, in any case, of itself, create a private
corporation. Such an act interferes with individual prop-
erty. The act of creation is in the nature of a bargain be-
tween the government and private persons. The act must,
therefore, be conditional, unless a previous assent be given
by 'those who propose to be incorporated. The artificial
being can never be considered as complete in its legal con-
formation, until the charter is accepted in some form. I
speak of private corporations. It is agreed that it may be
otherwise in regard to counties, towns, villages, and other
corporations merely municipal, such as are political in their
character, or created for the purposes of civil government,
in a certain district of country. These are exceptions to
the two-third clause in the constitution, inasmuch as they
do not come within the reason which led to its enactment.
*The People* v. *Morris,* 13 *Wendell,* 325. And as the taxa-
tion and other burthens which follow their creation, are but
the taking of private property for public use, in consideration
of the compensation derived from corporate privileges, the
legislature have not considered it necessary that every indi-
vidual whose rights may be incidentally affected by their ope-
ration, should give his assent. That was never so in respect
to a private corporation. *See Angel & Ames on Corp.* 46,
47, *and the cases there cited.* This must always be formed
by voluntary associates, under the sanction of an act of incor-
poration.

It was supposed, on the argument, that this conventional
feature in the associations to be formed under the banking
law, destroyed their character as corporations, which were
said to be the mere creatures of the legislature, or of the sove-
reign power. As that can never be the sole creative pow-
er, the argument of course fails. Both partnerships and
private corporations are conventional, so far as the members
are concerned. The difference consists in this, the former
is authorized by the general law among natural persons,

exercising their ordinary powers; the latter by a special authority, usually, if not necessarily, emanating from the legislature, and conferring extraordinary privileges: among the most prominent of which are concentrated, permanent, individual existence and operation, with corporate succession of membership, rights and liabilities. Substitute, as is done by some books, *Kyd on Corp.* 2, 3, *continuation* or *being* for *succession*, yet the distinction is the same. What more striking power of *continuation*, than is awarded by the general banking law? A law which literally confers on the beings of its creation a duration of existence any where within the power of numbers: almost seeking to realize, what has heretofore been considered a fanciful attribute even when predicated of corporations, *immortality*, or *eternal duration*. *Perpetual successions*, is however, the term made use of by the law. 1 *Kyd on Corp.* 2. " The distinction," says Kyd, *id.* 3, " between the succession of a *community not corporate*, and that of a corporation, is this : that the first has *succession* in a natural manner, as one generation succeeds another; the second has *succession* as a community modified, or put into a particular form, and under a *special denomination*, as of a mayor and commonalty, bailiffs and commonalty, or the like, which is a *complex kind of succession*, being both *natural* and *artificial*."

It was also said the legislature must give the *name* of the corporation. That is true enough, but it may be done either in the statute itself, or the act may allow the corporation to choose its own name. Such has been the constant course under our statutes authorizing the incorporation of religious institutions, and some others. It is well settled that the king alone may delegate the power both of creating and naming corporations. 1 *Kyd on Corp.* 50. Can there be a doubt that legislative delegation would be equally efficient? It has, I believe, been exerted and long acted upon without question, in the case of the Regents of the University. The creation of the *name*, as well as the corporation itself, may be by an act of the sovereign power, exerted either *mediately* or *immediately*, according to circumstances.

Thomas v. Dakin.

Being clearly of opinion that the legislature had the constitutional power to authorize the creation of an indefinite number of corporations, be they of one sort or another, by a two-thirds vote, it becomes unnecessary for me to inquire, at much length, whether a general corporation law may actually demand the same constitutional number of voices, as if it had been confined to the direct creation of a corporate bank by name. It was not denied on the argument that such general law was equally within the letter, nor have I been able to see that it is not as much within the spirit of the constitution, as an ordinary bank charter. The evil complained of, and which operated more than any other upon the mind of the convention, I have no doubt was the already inordinate multiplication of banking institutions, and the danger of their increase under the facilities of a mere majority vote. The convention were desirous to avert the curse of an irredeemable paper currency, a necessary consequence of excessive banking. *See per Yates, J. in Myers v. Irwin, 2 Serg. & Rawle, 372, 3.* That a general banking law is so obviously clear of all tendency to that consequence, as to warrant us in judicially restricting the meaning of the constitution to certain kinds of moneyed corporations, when the words it uses extend to all, seems to me an argument which cannot be sustained for a moment, either historically, or by any rule of judicial construction. It is said that the passage of general laws creating corporations had never been corruptly procured. The same thing may be said of statutes incorporating many institutions for private purposes. If we are to take practical corruption as the limit, it follows that a majority vote will be effectual in creating all sorts of corporations, except those whereof we may have heard of imputed corruption. That would be to dismiss the express prohibitory words of the constitution, and go upon the ground of hearsay and conjecture. If not, we must nullify the clause ; for I believe it was not contended on the argument, that we could be judicially satisfied by the reception of legal evidence.

But this branch of the argument need not be pursued ; for it was agreed on both sides, at the bar, that we must, on

this record, presume the general banking law to have been passed by two-thirds of all the members elected to both houses. We must clearly do so until the fact is denied by plea. The requisite constitutional solemnities in passing an act which has been published in the statute book, must always be presumed to have taken place until the contrary shall be clearly shown. Should the defendant withdraw his demurrer, and plead specially that the law in question did not receive the assent of two-thirds, as required by the constitution, it will then be in order to pass upon the validity of such an objection.

Being clear that the plaintiff's declaration is sufficient in substance, and that he has technically and aptly set forth his cause of action according to the statute, I think there should be judgment for him, with leave to withdraw the demurrer, and plead on payment of costs.

By BRONSON, J.—I concur fully in the opinions expressed by my brethren, that associations formed under the general banking law are corporations, and that the assent of two-thirds of all the members elected to each branch of the legislature was necessary to the passing of the act. But, as at present advised, I cannot concur in the opinion that the legislature has the constitutional power, although two-thirds may assent, to provide by a general law for the creation of an indefinite number of corporations at the pleasure of any persons who may associate forth at purpose.

It was conceded on the argument, that the demurrer does not reach the objection that the act was not passed by a two-thirds vote ; and I have not, therefore, considered the question whether we can look beyond the statute book. A plea may render it necessary for us to pass upon that question.

Judgment for plaintiff.